## CITY AND COUNTY OF DENVER v. DENVER TRAMWAY CORPORATION (Appellee by Substitution).*

Circuit Court of Appeals, Eighth Circuit.
December 8, 1927.

No. 7760.

1. **Appeal and error ⚖1099(2)—Jurisdictional questions, presented and decided on former appeal, are not open to review.**

Jurisdictional questions, presented and decided on former appeal in the same case, are not open to review, since first decision becomes law of case.

2. **Courts ⚖280(1)—Liberality of practice should be indulged in determining jurisdiction of court as federal court.**

When the jurisdiction of a court as a federal court is called in question, liberality in practice should be indulged, to the end that the question may be indubitably heard and determined.

3. **Courts ⚖264(3)—Federal court, having jurisdiction of main suit, had jurisdiction of ancillary suit arising on city's intervention in receiver's petition for aid and advice.**

Receiver's petition for aid and advice *held*, by reason of intervention of city and amendment naming city defendant to such petition, converted into an ancillary suit in equity against the city, with purpose to conserve assets, prevent depreciation, and insure collection of such charges as street railway was lawfully entitled to, authorizing jurisdiction of federal court in which main suit was pending.

4. **Courts ⚖264(3)—Jurisdiction in ancillary receiver's suit had sufficient basis in jurisdiction in main suit.**

Jurisdiction of federal court in ancillary suit by receiver against city had sufficient basis in jurisdiction in main suit.

5. **Appeal and error ⚖1096(3)—City for more than five years and on former appeal, treating suit as one in equity between it and receiver, cannot on later appeal contend otherwise.**

Where city, intervening in receiver's petition for aid and advice, acquiesced in procedure making it a defendant, thus becoming a party to ancillary suit in equity, and both parties for more than five years, and on a former appeal treated the cause as a suit in equity between receiver and city, it is too late on subsequent appeal for city to contend, through new counsel, that there is no suit in equity pending, or that it is not party thereto.

6. **Amicus curiæ ⚖3—Amicus curiæ cannot take exceptions to rulings, take case from one court to another, or apply for rehearing.**

An amicus curiæ cannot take exceptions to rulings of court, cannot take case from one court to another by appeal or writ of error, or cannot apply for a rehearing.

7. **Appeal and error ⚖671(3)—Questions raised by assignments as to which evidence was not returned in transcript of record are not reviewable.**

Where evidence relating to questions raised by assignments of error has not been returned

*Rehearing denied February 20, 1928.

in transcript of record, such questions are not before the appellate court for review.

**8. Appeal and error ☞1078(5)—Assignment of error, not argued, will be deemed waived.**

Assignment of error, challenging certain finding in decree, which has not been argued, will be deemed waived.

**9. Appeal and error ☞882(3)—City, having prior to and since commencement of litigation by street railway taken position that ordinances granting franchises were valid, cannot thereafter contend ordinances were void ab initio.**

Where city, prior to and since commencement of litigation involving fare to be charged by street railway, had repeatedly taken position that ordinances granting franchise were valid, and had taken the further position that they contained contracts relating to fares binding on the company, it is not in a position to contend, on appeal from decree enjoining fixing a certain fare, that such ordinances were void ab initio, since, had invalidity been asserted at the outset, the company could have introduced evidence of ratification on the part of the city, or facts which would have constituted an estoppel.

**10. Appeal and error ☞1097(1)—Rulings on former appeal become law of case.**

Rulings on former appeal become law of case, and are not open to review on subsequent appeal.

**11. Trial ☞396(6)—Trial court held justified in making finding in reference to duration of street railroad grants in proceeding involving city's right to regulate fares.**

Where, at time of litigation between city and receiver for street railway, involving city's right to regulate fares, ordinance relative to franchise was about to expire, and it was important for street railway to know whether it would then be occupying streets as a mere licensee, or as a grantee under easements under two former ordinances, the trial court was justified in making a finding in reference to duration of grants contained in such ordinance.

**12. Estoppel ☞62(4)—City, acting in proprietary capacity, is subject to many of same restrictions as individual, including estoppel.**

In acting in a proprietary capacity, city is subject to many of the same restrictions as a private individual, including estoppel.

**13. Street railroads ☞28(2)—Right of way grant to street railroad held without time limit, in absence of constitutional or statutory limitations.**

Grants by city of right of way to street railroad, which by their terms were unlimited as to duration and contained power of assignment, were without time limit, in absence of constitutional or statutory limitations.

**14. Street railroads ☞28(2)—Grant to street railway of right of way without time limit, and containing power of assignment, held grants in perpetuity (Const. Colo. art. 2, § 11; art. 5, § 25).**

Const. Colo. art. 2, § 11, and article 5, § 25, not expressly prohibiting city's granting easements without limit of time, grants of right of way to street railway, which by their terms were unlimited as to duration and contained power of assignment, held to constitute grants in perpetuity.

**15. Courts ☞367(1)—State court decisions, construing state constitutional provisions after rights had accrued, are not binding on federal courts.**

State court decisions, construing state constitutional provisions after rights had accrued under certain ordinances, are not binding on federal courts; but federal courts will exercise their own independent judgment on questions involved.

Appeal from the District Court of the United States for the District of Colorado; Robert E. Lewis, Judge. Transferred from Supreme Court of the United States.

Creditor's bill by the Westinghouse Electric & Manufacturing Company against the Denver Tramway Company, wherein the receiver thereafter appointed filed a petition for advice, aid, and instruction of the court, and the City and County of Denver intervened as defendant. From the decree, the intervener appealed to the Supreme Court, from which the appeal was transferred. Modified, and, as modified, affirmed.

See, also, 3 F.(2d) 285.

Thomas H. Gibson and Henry E. May, both of Denver, Colo., for appellant.

Gerald Hughes, of Denver, Colo. (Clayton C. Dorsey, of Denver, Colo., on the brief), for appellee.

Before WALTER H. SANBORN and BOOTH, Circuit Judges, and MILLER, District Judge.

BOOTH, Circuit Judge. This is an appeal from a final decree enjoining the City and County of Denver, Colo., hereinafter called the City, from enforcing against the Denver Tramway Company the provisions as to street car fares contained in certain ordinances, and granting other relief. The appeal was taken direct to the Supreme Court of the United States, but was transferred by order of that court to this court, under the authority of the Act of September 14, 1922 (42 Stat. 837, c. 305 [Comp. St. § 1215a]). See 273 U. S. 657, 47 S. Ct. 343, 71 L. Ed.

A short review of the history of the litigation is necessary to a proper understanding of the present appeal:

December 24, 1920, the Westinghouse Electric & Manufacturing Company, a citizen and resident of the state of Pennsylvania, filed a creditor's bill against the Denver Tramway Company, a citizen and resident of

the state of Colorado, hereinafter called the company, in the United States District Court for the District of Colorado. Federal jurisdiction was based upon diversity of citizenship and the requisite amount involved. The bill alleged the ownership and operation by the Company of the street railway lines in the City of Denver and certain interurban lines; that the property of the Company was subject to certain mortgage liens; that default had been made in payment of interest on certain of the bonds and notes of the company; that the Company was indebted to plaintiff in the sum of more than $13,000 for street railway material and supplies furnished by plaintiff to the Company at the latter's request; that said sum was past due; that demand for payment had been made and refused, though the debt was admitted by the Company; that certain taxes, which constituted a first lien upon all the property of the Company, were unpaid, together with many other obligations; that plaintiff had no adequate remedy at law; that the bill was filed by plaintiff on its own behalf and on behalf of all other creditors similarly situated. The appointment of a receiver was asked. On the same day Mr. E. Stenger was duly appointed receiver, with the usual powers.

February 10, 1921, the receiver filed in the creditor's suit his petition concerning fares and operating conditions. The petition set forth the history of the Company; the ownership of the lines of street railway in and adjoining the city; mortgage indebtedness of the Company, amounting to $19,383,-000; secured notes of the Company, amounting to $200,000, and other obligations for operating expenses and unpaid taxes; the capital stock of the Company, amounting to $10,000,000; that the properties and assets of the Company included certain franchises, grants, and licenses, among them Ordinance No. 3 of 1885 and amendments, Ordinance No. 36 of 1888 and amendments, and Ordinance No. 74 of 1906; that there was no contract between the Company and the City fixing the rate of fare, and no power in the City to make such a contract for any specified time; that the provisions in the ordinances relative to the rates of fare were regulatory only; that the Company and its predecessor had never been able to earn a fair return upon the reasonable value of the property used and useful in the service; that the value of such property as of January 1, 1918, was $35,959,884, and the present value was not less; that since January 1, 1918, the price of materials and wages had both greatly increased; that on May 3, 1918, the Company filed a petition with the Public Utilities Commission of Colorado setting forth the increase in operating expenses and its inability to meet the same with the then existing 5-cent fare; and it requested a valuation of its property and an increase in fare; that in September, 1918, the Public Utilities Commission, as a measure of emergency relief, made an order allowing an increase in fare to 6 cents; and the City also in September, 1918, as an emergency measure, passed an ordinance allowing a 6-cent fare; that in December, 1918, the Public Utilities Commission made its findings, including value of the property, $23,674,100; reasonable annual depreciation charge, $500,-000; reasonable rate of return, 8 per cent. It ordered that the fare should be at once raised to 7 cents, with 1 cent for transfer. The petition of the receiver further alleged that this valuation of the Public Utilities Commission was based upon pre-war values prevailing from 1908 to 1918; that the 7-cent fare was put into effect, but lasted a few weeks only; that on January 14, 1919, the Supreme Court of Colorado decided that the Public Utilities Commission had no jurisdiction over rates in the City, but that the authority in that respect rested in the City; that thereupon the Company resumed the 6-cent fare; that the wages of the employés had been several times increased since 1915; that in 1918 the War Labor Board increased the wages approximately $506,000 per year; that in 1919 a board of arbitration further increased the wages; that the total increases had been as follows:

| | | | |
|---|---|---|---|
| 1916 ................ | $ | 21,000.00 | per year |
| 1917 ................ | | 161,000.00 | "    " |
| 1918 agreement ...... | | 225,000.00 | "    " |
| 1918 War Labor Board | | 506,000.00 | "    " |
| 1919 arbitration award | | 400,000.00 | "    " |
| | | | |
| Total ........... | | $1,313,000.00 | |

That the above wage increases amounted to approximately 100 per cent. of the wages paid prior to 1916; that on June 30, 1919, an ordinance was passed repealing the 6-cent fare ordinance of 1918; that on July 28, 1919, an ordinance was passed providing for a 6-cent fare for a period of 90 days; that on November 10, 1919, another ordinance was passed permitting a 6-cent fare, and that such fare was in effect at the time of filing the petition; that repeated requests had been made that the City pass an ordinance providing for an increase of fare over the 6-cent rate, but that the City had refused so to do and had threatened the use of the police to

23 F.(2d)—19

prevent the Company from attempting to collect more than a 6-cent fare; that the Company, failing to get an increased fare, sought in 1920 to reduce the wages of its employés, but the City brought suit and obtained an injunction against the Company, preventing such reduction; that during this same year the employés of the company demanded further increase of wages, and, it being refused, a strike occurred; that this lasted for several months, during which time the Company suffered loss through destruction of property and loss of revenue of more than $500,000; that the street railway system had at all times been efficiently and economically managed; that its present fair value, as above stated, was $35,959,884; that a fair rate of return was at least 8 per cent.; that $500,000 was a fair amount for annual depreciation.

The petition also set forth tables showing the gross and net income from 1914 to 1920, and the interest and fixed charges for those years. The petition further alleged that upon the value above given the return for the years 1918, 1919, 1920, was 1.77, 2.79, 0.53 per cent., respectively; that, computed on the valuation found by the Public Utilities Commission ($23,674,100), the return for the years mentioned would have been 2.70, 4.25, and 0.80 per cent., respectively. The petition further showed that on December 24, 1920, there were outstanding unpaid overdue obligations of the Company amounting to more than $900,000. The petition further alleged that none of the ordinances mentioned as fixing fares were contractual in that respect, but all were regulatory only; that the provisions in said ordinances and in each of them, fixing the rates of fare, were confiscatory of the Company's property and violative of the Federal Constitution, and would continue so to be; that in view of the attitude and threats of the City, it would be impossible for the Company to put into effect a fare in excess of 6 cents without resort to force.

The petition prayed for the advice, aid, and instructions of the court.

Thereafter the City presented to the court an application for leave to intervene, to be made defendant, and to interpose an answer to the petition. The application was granted. The City was made defendant to the receiver's petition, but not to the main suit. Thereupon the receiver amended the title to his petition by naming the City as defendant thereto, and also amended the prayer of his petition by asking relief against the City. The City then answered the amended petition.

The amended prayer of the petition asked for a temporary injunction restraining the City and its agents from enforcing the ordinances relating to fares mentioned in the petition, also from interfering with the Company in the collection of a fare of 10 cents; that the ordinances mentioned be adjudicated noncontractual, so far as relating to fares; that any regulations of the City fixing the fare at 6 cents be adjudged confiscatory and violative of the constitutional rights of the Company; that the fair present value of the property of the Company devoted to the public use be ascertained and fixed, together with such percentage of return thereon as would avoid confiscation of the property; that other proper relief be granted.

The City, in its answer to the amended petition, as its second defense, denied that the ordinances of 1885 and 1888 were noncontractual, so far as relating to fares, but alleged that they and the ordinance of 1906 were contractual, and that the City had full power to make the same; denied that the value of the property of the Company was as alleged in the petition; denied that the Company had suffered any confiscation of its property; denied that the ordinance of 1919 fixing the fare at 6 cents was unconstitutional or confiscatory of the Company's property; admitted request by the Company for an increase of fare over 6 cents, and that the City had not granted it; denied that the provisions in the said ordinances relating to fares must be exercised in accordance with any requirements of the Federal Constitution, and alleged that enforcement of the ordinance contracts was not violative of the Federal Constitution; admitted that the mayor and city council had refused to authorize an increase of fare above the 6-cent rate.

Upon the pleadings thus joining the issues, and upon affidavits, the court after full hearing granted a temporary injunction, restraining the City from enforcing a maximum fare of 6 cents, and authorized the receiver to charge fares not in excess of 8 cents, with two tickets or tokens for 15 cents, and to cause to be issued to each passenger upon request a receipt for the excess over 6 cents. From this order the City appealed to this court. The order of the trial court was affirmed. 277 F. 865.

Thereupon the court appointed a special master to take and report the testimony, and make findings of fact and such conclusions of law as he might deem essential to the proper advisement of the court. The special master made his report June 25, 1924. Many exceptions were taken by the receiver to the re-

port, and the following exceptions were taken by the City:

"That the report of said special master is erroneous and void and of no force or effect whatever, and should be stricken from the files, in that—

"(a) The petition of the receiver in said cause is insufficient to constitute any cause of action, in equity or at law, and does not state facts sufficient to confer jurisdiction upon this honorable court to appoint said special master or to give said purported report any consideration whatever.

"(b) That the petition of the receiver in said cause fails to state facts sufficient to confer upon this honorable court jurisdiction of the subject-matter, and the appointment and purported report of said special master were and are beyond the jurisdiction of this honorable court and without authority, either legal or equitable."

The court overruled the exceptions of the City, allowed some of those taken by the receiver, and disallowed others. Final decree was entered December 30, 1924.

The court by its decree found that there was not, and never had been, a contract between the City and the receiver or the Company, or the predecessors of the Company, fixing the fares which should be paid by passengers using the street railway system; that the provisions of Ordinance 3 of 1885 and Ordinance 36 of 1888 purporting to limit the fares were noncontractual in form and effect, but were regulations in the exercise of the police power of the City, valid, legal, and enforceable only if the same were nonconfiscatory and not in violation of the provisions of the federal Constitution. The court further found by its decree that the present value of the property of the Company used and useful in the public service, less accrued depreciation, was $23,514,769; that a reasonable allowance for annual depreciation was $450,000; that a reasonable rate of return was 7½ per cent. The decree did not find specifically what the gross and net revenue were during past years, but it did approve the findings of the special master on these matters, which were to the effect that from 1918 to 1920, inclusive, with a fare of 5 cents in force during part of the time and a fare of 6 cents during a part, the returns ranged from one-half of 1 per cent. to less than 5 per cent.; and that during the years 1921–1923, inclusive, from the best estimates obtainable, the returns on the basis of a 6-cent fare would have been less than 3 per cent.; all on the special master's valuation,

which was approximately $3,500,000 lower than that found by the court. On the matter of confiscation, the court by its decree specifically found as follows:

"VI. Those provisions of Ordinance 122 of 1919 (Exhibit E to the petition), limiting or purporting to limit the fares to a maximum of six cents for adults and three cents for children under 12 years, and those provisions of the franchise of May 15, 1906 (Exhibit A to the petition), Ordinance 3 of 1885 (Exhibit A–1 to the petition), and Ordinance 36 of 1888 (Exhibit A–2 to the petition), limiting or purporting to limit the fares to a maximum of 5 cents for adults and 2½ cents for children under 12 years of age, and each and every thereof, and all other ordinances and regulations so fixing or attempting to fix the fares at a maximum of 6 cents or less for an adult and 3 cents or less for children under 12 years, are confiscatory, illegal, void, and in violation of the constitutional guaranties afforded by the Federal Constitution to the petitioner and the Denver Tramway Company and their successors or assigns, and particularly the Fourteenth Amendment to the Federal Constitution.

"VII. The aforesaid provisions of the above-described ordinances and franchise, and any other provisions of law or ordinances, and any regulations prescribed thereunder, are likewise confiscatory, unconstitutional, illegal, and void, in so far as they require the petitioner or the Denver Tramway Company, or the successors or assigns of them or either of them, to put into effect or maintain fares or charges for the transportation of passengers upon their street railway system in the City and County of Denver less than those which will afford to him or it a just compensation therefor, or under present circumstances and values less than a 7½ per cent. net annual return upon a valuation of $23,514,769 for the used and useful property of the city lines of the Denver Tramway Company."

The court by its decree further found:

"VIII. Ordinance 3 of 1885 (Exhibit A–1 to the petition) and Ordinance 36 of 1888 (Exhibit A–2 to the petition) contain and constitute valid and existing grants, without time limit, of rights of way and easements on the streets, avenues, viaducts, and bridges of the City and County of Denver to the Denver Tramway Company, its successors and assigns, to construct, build, equip, maintain, and operate its street railway system thereon, and that said rights and easements have at all times been asserted and maintained, and up to the present time have been exercised as cir-

cumstances have required, by the construction and operation of the present street railway system of the Denver Tramway Company in the City and County of Denver, and which said rights and grants are not limited or affected by the franchise of May 15, 1906, under the circumstances and conditions more fully in said franchise set forth. Such grants of rights of way and easements contained in Ordinance 3 of 1885 and 36 of 1888, are property belonging to the Denver Tramway Company, its successors and assigns, and have a present value of $2,000,000, but are not included in the rate base found in this proceeding, or allowed in any amount whatsoever as an element of value affecting the rates or fares to be charged by the Denver Tramway Company or its successors and assigns."

Injunctive relief was adjudged by the decree against the City, its officers, and employés, as follows:

"(a) From in any way enforcing or attempting to enforce against the petitioner, the Denver Tramway Company, the successors or assigns of them, or either of them, or the agents, representatives, or employés of them, or either of them, any of the provisions of Ordinance 122 of 1919, Ordinance 3 of 1885, Ordinance 36 of 1888, or the franchise of May 15, 1906, or any other ordinance or regulation of the City and County of Denver fixing a maximum fare of six cents or less for adult passengers and three cents or less for children under 12 years of age, or enforcing or attempting to enforce any asserted rights or contentions contrary to the provisions of this decree;

"(b) From in any way interfering or attempting to interfere with the collection by petitioner, the Denver Tramway Company, or the successors or assigns of them, or either of them, of such fares for the carriage of persons on the city lines of the street railway system of the Denver Tramway Company as may be fixed and established by the petitioner, the Denver Tramway Company, or their successors or assigns, provided the net return therefrom shall not exceed 7½ per cent. on a valuation of $23,514,769 for said city lines, and after deducting from the gross income all costs of operation, including taxes, franchise payments, and an allowance of $450,000 per year for a depreciation reserve, or interfering or attempting to interfere with the rights and easements of the petitioner, the Denver Tramway Company, or their respective successors or assigns, as fixed and determined by this decree;

"(c) From bringing or causing to be brought any litigation or action or proceeding to enforce the provisions of the aforesaid ordinances or franchise limiting the maximum fares to six cents or less for an adult passenger and three cents or less for children under 12 years, or to compel compliance by petitioner or the Denver Tramway Company, or their successors or assigns, with said provisions or any of them relative to said maximum fares or charges or to interfere with or attempt to interfere with the collection of such fares and charges by the petitioner and the Denver Tramway Company, or their respective successors and assigns, as are permitted under the terms of this decree as non-confiscatory charges, or to enforce any contention or claims contrary to the provisions of this decree respecting the rights and easements of the Denver Tramway Company, its successors or assigns, under Ordinance 3 of 1885 and Ordinance 36 of 1888."

The decree further provided:

"Nothing in this decree contained shall in any manner or degree whatsoever be a limitation or restriction on the legislative power of the City and County of Denver properly and legally to regulate the fares to be charged by the petitioner, the Denver Tramway Company, or their respective successors or assigns, for the carriage of passengers on the city lines of the street railway system of the Denver Tramway Company and its successors or assigns, which said power is a continuing one in the city and county of Denver: Provided only that such regulations or attempted regulations shall not be confiscatory in character and in violation of those provisions of the Constitution of the United States against the taking of property without due process of law and depriving the petitioner or the Denver Tramway Company, or their successors or assigns, of the equal protection of the laws and with the right retained to petitioner, the Denver Tramway Company, and their respective successors or assigns, either in this proceeding and under this decree or independently to question and litigate the legality and constitutionality of any such subsequent exercise of the regulating power of the city and county of Denver in fixing or attempting to fix the fares to be charged by petitioner, the Denver Tramway Company, or their respective successors and assigns. * * *

"XI. At any time while the injunction herein granted remains in force, any party hereto, or his or its successors or assigns, may apply by notice at the foot hereof to vacate,

modify, or extend the foregoing injunction because of any change of circumstances since the entry hereof, or for any additional relief to which he or it may deem himself or itself entitled by reason of any acts or events occurring after the date of this decree."

As heretofore stated, an appeal from the decree was taken to the Supreme Court and transferred by that court to this court.

### The Question of Jurisdiction.

At the outset we are met by the claim of the City that the court below was without jurisdiction either as a federal court or as a court of equity.

The Company contends that the question of jurisdiction was passed upon adversely to the City upon the former appeal (277 F. 865), and that that decision has become the law of the case.

It is clear that prior to the former appeal certain jurisdictional questions were raised in the trial court. This appears from the answer of defendant City. The first defense was a motion to dismiss. Among the grounds were the following:

"2. That from the facts as shown on the face of said petition this court is without jurisdiction or right to grant said relief prayed for.

"3. That as appears from the facts contained in said petition this court has not the jurisdiction nor the right to make an order giving the receiver the right to charge an increased fare, as prayed for.

"4. That as appears from the facts contained in said petition this court has no jurisdiction nor right to set aside the fares fixed by ordinance to be charged on said tramway system, and has no jurisdiction nor right to regulate or fix the fares to be charged by said receiver on said tramway system. * * *

"6. That the facts contained in said petition are insufficient to constitute a valid cause of action in equity or in law, or to confer any authority, jurisdiction or right upon this court to declare or authorize said receiver to declare or treat said franchise of May 15, 1906, to be illegal, unconstitutional or void, or to authorize or in any manner permit the said receiver to violate the terms thereof."

The motion was denied, as appears from the following excerpt from the order granting the interlocutory injunction:

"Fourth. The motion of the City and County of Denver to dismiss, as contained and set forth in its first defense of its 'petition in intervention and answer of City and County of Denver,' is hereby denied."

On the appeal the pleadings were part of the record. The assignments of error covered the jurisdictional questions raised by the motion to dismiss. That the jurisdictional questions were argued on that appeal appears conclusively from the closing paragraph of the City's brief on that appeal. It reads as follows:

"Our position, as we have endeavored to show, is that under the law of the case the District Court had no jurisdiction to issue, or erred in issuing, a temporary injunction, in any event, and that it erred in not sustaining our motion to dismiss, as well as our defenses."

Furthermore, jurisdictional questions were considered and passed upon by this court on that appeal. This appears from the opinion of the court, in which it was said:

"This is an appeal from an order granting a temporary injunction and denying appellant's motion to dismiss the petition of appellee."

The court further said:

"As appellant answered the petition, no separate discussion is necessary in regard to the motion to dismiss, as the questions raised on the appeal are the same."

And finally the court said:

"We think the trial court acted in the premises clearly within the law and the facts, and the order granting the temporary injunction, and refusing to dismiss the appellee's petition, should be affirmed; and it is so ordered."

It is clear, therefore, that jurisdictional questions were involved on the former appeal, that they were presented to the court, and that they were decided by the court adversely to defendant.

On the present appeal the assignments of error raising jurisdictional questions are very similar to those on the former appeal, and are based upon the same motion to dismiss.

[1] It thus appears that this same motion to dismiss containing alleged jurisdictional grounds is now before this court which was before it on the former appeal, and that the assignments of error touching the jurisdictional questions are substantially the same on the two appeals. It follows that, in so far as the jurisdictional questions now presented were presented and decided upon the former appeal, they are no longer open to review. That decision has become the law of the case.

[2] But it is strenuously urged by counsel for the City that not all of the jurisdictional questions now sought to be presented to this court were presented on the former appeal. We do not approve such piecemeal presentation; yet, inasmuch as the questions now urged are asserted by counsel to go to the jurisdiction of the court as a federal court, and there may be doubt whether they have heretofore been passed upon, we think that they should be considered at this time. When the jurisdiction of the court as a federal court is called in question, liberality of practice should be indulged, to the end that the question may be indubitably heard and determined. The present contention of the City on the question of jurisdiction is thus stated by its counsel:

"The cause petition filed by the receiver in the Westinghouse Electric Company Case, not having invoked the jurisdiction of the lower court for the adjudication of any right or title of any one, and the court, as a matter of law, being without jurisdiction upon such a petition to adjudicate any right or title of a stranger to the cause in which the petition was filed, it follows as a necessary conclusion that the court was without jurisdiction to enter the decree complained of and that said decree is null and void.

"* * * The court was without jurisdiction, either as a federal court or court of equity, to *adjudicate* any question, and much less to render the decree of which complaint is made, for the simple reason that there was no 'case' or 'controversy' before the court for adjudication at all.

"* * * If the receiver could have in any case sought in the lower court such relief as that which the decree complained of purports to grant, necessarily he would have had to do so by filing an original bill of an ancillary nature, and that he could do so only after leave granted for that purpose and as a representative of the Tramway Company."

[3] It is true that, when the receiver presented his petition of February 10, 1921, to the court, it was simply a petition seeking advise, aid, and instructions. But thereafter, on February 16, 1921, the City asked leave to intervene and be made a party defendant, and to answer the petition of the receiver. The court by formal order granted the application. The receiver thereupon, in view of the fact of the presence of the City as a defendant to his petition, amended the prayer of his petition by asking appropriate relief against the City, and amended the title to the cause by naming the City a defendant to the receiver's petition. There was thus pending in court at and before the time when the City filed its answer, a petition by the receiver in which the City was named as defendant, which stated a cause of action against the City, and contained a prayer for relief against the City. The proceeding was thus converted from a petition by the receiver for aid and advice into an ancillary suit in equity by the receiver against the City.

The suit was ancillary to the main suit, since its purpose was to conserve the assets of the Company, prevent depreciation, and insure the collection of such charges as the Company was lawfully entitled to collect. The power of the court to aid the receiver in the management of the property under his control was invoked by this ancillary bill just as clearly as it was by the receiver's petition in its original form. The jurisdiction of the court in such cases is well established. Landon v. Public Utilities Commission of Kansas (D. C.) 234 F. 152. The court in its opinion in that case, speaking by Circuit Judge Sanborn on the question of jurisdiction, said:

"Now, whenever it appears to the receiver of this court, or of any court, which has control or management of property of this character, that there is danger of its destruction or depreciation by the wrongful act of any one, it is the duty of that receiver to apply to the court, whose hand he is, to protect that property from such destruction or interference. And pursuant to that duty this receiver, whose only power over the Oklahoma and Missouri property is derived from this court, has applied to this court by this dependent bill to exercise its power to prevent the depreciation of the property in his possession."

This case on appeal was reversed on another point, but sustained as to the question of jurisdiction. 249 U. S. 236, 39 S. Ct. 268, 63 L. Ed. 577. Touching that question, the Supreme Court said (page 244 [39 S. Ct. 269]): "We think the trial court properly overruled the objections offered to its jurisdiction and nothing need be added to the reasons which it gave. 234 F. 152, 155." See, also, City of Minneapolis v. Rand, 285 F. 818 (C. C. A. 8).

[4] Jurisdiction of the court in the ancillary suit had sufficient basis in the jurisdiction in the main suit. White v. Ewing, 159 U. S. 36, 15 S. Ct. 1018, 40 L. Ed. 67; Wabash R. Co. v. Adelbert College of the Western Reserve University, 208 U. S. 38, 28 S. Ct. 182, 52 L. Ed. 379; Gibson v. Vinton, 21 F. (2d) 168 (C. C. A. 8). Furthermore, the petition in the ancillary suit set forth the

existence of federal questions sufficient to give the court jurisdiction.

[5] If the court, after the receiver had filed his petition and before the City had asked to intervene and be made a party defendant, had instructed the receiver to bring suit against the City, using as his bill the same petition with its amended prayer, and if the City had been served with a subpœna in equity, there can be no doubt that the court would have acquired jurisdiction over the suit, both as to the parties and as to the subject-matter. The application of the City to be made defendant, and the order of the court granting the application, and the amendment by the receiver to his petition accomplished the same result. The City acquiesced in this procedure, and raised no objection to its regularity. By becoming voluntarily a defendant, and by answering the amended petition of the receiver, the City became a party to the ancillary suit in equity and subject to the jurisdiction of the court.

For more than five years the parties to the suit, the trial court, and this court on the former appeal have all treated the cause as a suit in equity between the receiver and the City. It is too late now for the City to contend through new counsel that there is no suit in equity pending or that it is not a party thereto. The City is plainly estopped.

The present counsel for the defendant City contend that the order of the trial court permitting the City to intervene and file an answer, and the filing thereof by the City, were both merely acts done for the purpose of constituting the City an amicus curiæ. This naive contention of present counsel finds no support in the answer itself, but is directly contradicted by the allegations of the answer; it is also directly negatived by the statement of the former counsel of the City, who actually filed the answer and presumably knew the reason for so doing. Former counsel in their brief on the prior appeal use this language relative to the intervention and filing of the answer:

"But afterwards, and on February 10, 1921, the said receiver filed a petition in said cause, which the District Court permitted to be filed as of January 17, 1921, entitled 'Petition Concerning Fares and Operating Conditions.' The City and County of Denver, having notice of the application, and seeing that its rights and the rights of its inhabitants were involved in a very substantial way, asked leave to intervene and to be made a party defendant to said petition. On February 16, 1921, the District Court ordered that the City and County of Denver be 'made a party defendant to said petition of the receiver, but not a party to the main suit,' and the City and County of Denver was granted leave to file its answer to said petition on or before February 26, 1921. The City and County of Denver thereafter filed its petition of intervention and answer to the petition of the receiver 'concerning fares and operating conditions.' There were certain things referred to in said petition, like operating conditions, with which the City was not concerned, but *the City intervened for the purpose of questioning the right of the court to make any order pursuant to which the receiver might put into effect an increased fare.*" (Italics ours.)

[6] The conduct of the City during the five years of litigation has not been that of an amicus curiæ. It is hornbook law that an amicus curiæ cannot take exceptions to the rulings of the court; cannot take the case from one court to another by appeal or writ of error; cannot apply for a rehearing. Yet the City in the present litigation has done each of these acts. It is clear that the City is and has been a real defendant, and has acted as such.

[7, 8] We turn to the questions involving the merits. Some of the questions raised by the assignments of error are not before this court for review, inasmuch as the evidence relating to such questions has not been returned in the transcript of record. See Wheeler v. Abilene Nat. Bank Bldg. Co., 159 F. 391, 16 L. R. A. (N. S.) 892, 14 Ann. Cas. 917 (C. C. A. 8), and cases cited. Such are questions relating to the valuation of the property going to make up the rate base, and relating to the net return to the Company; or in other words, the question of confiscation. As to the rate of return, the testimony has been included in the transcript of record, and an assignment of error challenges the finding in the decree; but since the assignment of error has not been argued, we deem it waived. Braden v. United States, 270 F. 441, 442 (C. C. A. 8); Weare v. United States, 1 F.(2d) 617, 618 (C. C. A. 8); Daniel v. Pappas, 16 F.(2d) 880, 883 (C. C. A. 8); Apt v. United States, 13 F.(2d) 126 (C. C. A. 8). Furthermore, the City is hardly in a position to attack the finding of the court as to the rate of return, inasmuch as the City has assigned as error the failure of the court to approve the report of the special master, which specifically fixed the rate of return as 7½ per cent. This figure was adopted by the court.

Validity of the Ordinances of 1885 and 1888.

[9] The present counsel for the City contend in their brief on this appeal that these ordinances were void ab initio and conferred no rights of any kind upon the predecessors of the Company, for the reason that the City was without power at that time to make the grants contained in the ordinances.

We think the City is not in a position to make such a contention at this time. The record shows that the City prior to and since the commencement of the present litigation has repeatedly taken the position that the Ordinances of 1885 and 1888 were valid, and has taken the further position that they contained contracts, relating to fares binding on the Company. The City in its answer alleged that "it had full right, power, and authority to make and enter into a contract, as part of the franchise provisions, covering the rates of fare, as contained and set forth in the franchise of May 15, 1906, of Ordinance 3 of 1885, and Ordinance 36 of 1888, when enacted." This allegation is reiterated. The assignments of error on the former appeal disclose the same contentions. On the former appeal on the petition for rehearing the City said:

"We contended, in our former brief, that the franchise rates fixed by the ordinances granting the franchises are binding between the parties. Two of these franchises, the one of 1885 and the other of 1888, were granted by ordinances of those years and accepted by the Tramway Company prior to the adoption of article 20 of the Constitution of Colorado. We did not contend that said franchise contracts were inviolable contracts; that they were contracts that the state in its sovereign capacity could not alter, but that, as betwen the contracting parties, such contracts were valid and binding until the proper rate regulating agency, in the exercise of its police power, saw fit to change them."

The court in its opinion states the position of the City on that appeal as follows (277 F. loc. cit. 867):

"The strongest form in which counsel state their position in regard to these alleged contracts is substantially as follows: The acceptance of the ordinances and franchises under which the Tramway Company and its predecessors operate a street railway in the city and county of Denver constituted contracts binding upon both parties, and that though such contracts as to rates to be charged by the Tramway Company are not beyond legislative control, yet there was power to make them in the first instance and that they are valid and binding as contracts until the city and county of Denver thinks proper to change the rate."

The same contentions by the City in support of the validity of the Ordinances of 1885 and 1888 were again reiterated in the assignments of error upon the present appeal.

Nowhere in the record does it appear that either on the trial in the court below, or on the former appeal to this court, there was any intimation on the part of the City that the Ordinances of 1885 and 1888 were void ab initio. The present belated change of position on the part of the City in now asserting the invalidity of the Ordinances of 1885 and 1888 has unquestionably been prejudicial to the Company. Had such invalidity been asserted at the outset, the way would have been open to the Company to introduce evidence of ratification on the part of the City, or of facts which would estop the City from asserting such invalidity. We do not think that a party can thus change position midway in the litigation of a cause after that litigation has extended for so long a period as in the present case. We think the maxim applies, Allegans contraria non est audiendus." Ohio & M. R. Co. v. McCarthy, 96 U. S. 258, 24 L. Ed. 693; Davis v. Wakelee, 156 U. S. 680, 689, 15 S. Ct. 555, 39 L. Ed. 578; Iron Gate Bank v. Brady, 184 U. S. 665, 22 S. Ct. 529, 46 L. Ed. 739; Sullivan v. Colby (C. C. A.) 71 F. 460; Brooks v. Laurent (C. C. A.) 98 F. 647, 655; Kansas Union Life Ins. Co. v. Burman, 141 F. 835, 842 (C. C. A. 8); Moore v. Beiseker, 147 F. 367, 375 (C. C. A. 8); Great Falls Nat. Bank v. McClure (C. C. A.) 176 F. 208; Jefferson Standard Life Ins. Co. v. Wilson (C. C. A.) 260 F. 593; Spitzer v. Board of Trustees for Regina Public School Dist. No. 4 of Saskatchewan (C. C. A.) 267 F. 121, 128; Second Nat. Bank of Allegheny v. Lash Corporation (C. C. A.) 299 F. 371; Sebastian Bridge District v. Hedrick, 4 F.(2d) 346 (C. C. A. 8).

It is but fair to state that this change of position on the part of the City has doubtless been due to a change of counsel.

Furthermore, the validity of the Ordinances of 1885 and 1888 has been sustained by this court, and is no longer open to question here.

In City of Denver v. Mercantile Trust Co., 201 F. 790, this court had under consideration the validity of the Ordinance of 1885. In a carefully considered opinion the ordinance was held valid. The duration of the grant under the ordinance was left undetermined, although it was intimated that it would extend

at least until 1935; i. e., during the corporate life of the Denver Electric Cable Railway Company, a predecessor of the present company.

Again, on the former appeal in this cause (277 F. 865), this court in upholding the temporary injunction, held that the Ordinances of 1885 and 1888 contained valid grants; that they granted to the predecessor of the Company rights of way and easements in the streets of the City occupied by the Company thereunder; that the rights of way and easements remained in existence after the passage of the franchise ordinance of 1906; that the rate of fare fixed by the ordinances was noncontractual and regulatory only.

We are not disposed to again review the questions passed upon in the two foregoing cases. We are satisfied that the decisions were right. The latter decision has become the law of this case.

### The Other Ordinances.

Ordinance No. 74 of May, 1906; Ordinance No. 50 of 1918; Ordinance No. 87 of 1919; Ordinance No. 122 of 1919—were also all before this court on the former appeal. It was held that the Ordinance of 1906 in specific terms provided that it should not prejudice the rights of the Company under the Ordinances of 1885 and 1888. It may be noted in passing that the Ordinance of 1906 by its terms expired in 1926.

It was further held on the former appeal that none of the ordinances above mentioned constituted contracts between the Company and the City relating to fares, first, because they were not contractual in form; second, because the City never possessed the power to make a contract suspending its power to regulate the fares charged by the Company. [10] These rulings also have become the law of the case, and are not open to review here. Such is the established practice in this circuit. Thatcher v. Gottlieb (C. C. A.) 59 F. 872; Haley v. Kilpatrick (C. C. A.) 104 F. 647; County Board of Com'rs of Ouray v. Geer (C. C. A.) 108 F. 478; Crotty v. Chicago Great Western R. Co. (C. C. A.) 169 F. 593; Great Northern R. Co. v. Western Union Tel. Co. (C. C. A.) 174 F. 321; Beiseker v. Moore (C. C. A.) 174 F. 368; National Surety Co. v. Kansas City Hydraulic Press Brick Co. (C. C. A.) 182 F. 54; Town of Fletcher v. Hickman (C. C. A.) 208 F. 118; United Mine Workers of America v. Coronado Coal Co. (C. C. A.) 258 F. 829; Whitfield v. Hanges (C. C. A.) 266 F. 69; Browne v. Thorn (C. C. A.) 272 F. 950; Barnett v. Kunkel (C. A.) 283 F. 24; Finley v. United Mine Workers of America (C. C. A.) 300 F. 972; Chouteau Trust Co. v. Massachusetts Bonding & Insurance Co. (C. C. A.) 1 F.(2d) 136.

In Guarantee Co. of North America v. Phenix Ins. Co., 124 F. 170, 174, this court, speaking by Circuit Judge Sanborn, said:

"Propositions of law which are considered and decided upon a first writ of error are res judicata upon the return of a subsequent writ in the same case, whether those propositions are right or wrong. They constitute the law of the case, and cannot be again questioned by the parties to the suit or their privies."

The rule applies, although the former appeal was from an interlocutory order granting a temporary injunction. Brown v. Lanyon Zinc Co., 179 F. 309 (C. C. A. 8); Field v. Kansas City Refining Co., 9 F.(2d) 213 (C. C. A. 8).

### Duration and Value of the Grants Contained in the Ordinances of 1885 and 1888.

Appellant challenges those portions of the decree contained in paragraph VIII above quoted, which declared the grants of rights of way and of easements under Ordinance No. 3 of 1885 and Ordinance No. 36 of 1888 to be "without time limit" and to "have a present value of $2,000,000." The duration of these grants was not passed upon by this court on the former appeal. The duration of the grant in Ordinance No. 3 of 1885 was considered by this court in City of Denver v. Mercantile Trust Co. of New York, 201 F. 790. In its opinion in that case the court said (page 808):

"The question of the duration of the grant to the Denver Electric & Cable Railway Company, its successors and assigns, under said Ordinance No. 3 of 1885, has been extensively argued. On the part of complainant it is urged that the grant is one in perpetuity. On the part of the city, it is insisted that it was not a grant in perpetuity, as such grant the city could not validly bestow, and the rights of the Denver Electric & Cable Railway Company under Ordinance No. 3, 1885, were those only of a licensee.

"A similar question was before this court in Omaha Electric Light & Power Co. v. City of Omaha, 179 F. 455, 102 C. C. A. 601. In that case it was held that there being no time limit for the existence of the grant mentioned in the ordinance, it was not intended to grant a perpetual franchise, but was a grant during the life of the corporation grantee; that its assigns or successors thereafter would hold and enjoy the same at the will of the city

only. By adhering to that decision we should be required to hold that the grant acquired under Ordinance No. 3 of 1885 continued until 1935, the corporate life of the Denver Electric & Cable Railway Company. But, as that case is now pending in the Supreme Court of the United States, and the rights of the complainant are fully protected by Ordinance No. 74 of 1906 until 1926, it is unnecessary for the protection of claimant's rights, and we think inexpedient, that that question be determined at this time. So the duration of the grant under said Ordinance No. 3 we leave without determination."

The case referred to in the excerpt was not determined on the merits by the Supreme Court (see 230 U. S. 123, 33 S. Ct. 974, 57 L. Ed. 1419), but its companion case, Old Colony Trust Co. v. City of Omaha, which involved the same ordinance, was decided on the merits by that court (see 230 U. S. 100, 33 S. Ct. 967, 57 L. Ed. 1410). The court held that the ordinance there involved constituted a grant in perpetuity.

The trial court in the case at bar based its finding as to the duration of the grants in the Ordinances of 1885 and 1888 upon the decision in the Old Colony Trust Co. Case, and other similar cases. While the finding as to the duration of the grants contained in the Ordinances of 1885 and 1888 was perhaps not strictly necessary to a determination of the case at bar, yet we think the trial court was justified in making a finding on the subject.

From the report of the special master it appears that the matter was litigated before him, but that he made no finding in respect to it, because he was of opinion that the value of the grants under the ordinances had no place in the rate base. In this latter conclusion the trial court agreed, but thought nevertheless that the duration and value of the grants should be passed upon.

[11] It must be borne in mind that, when the trial court passed upon the duration of the grants contained in the Ordinances of 1885 and 1888, the Ordinance of 1906 was shortly to expire, and since the entry of the final decree it has expired. It was, therefore, important to the Company to know whether, after the expiration of the Ordinance of 1906, it would be occupying the streets as a mere licensee, or as a grantee of easements under the two former ordinances, and, if the latter was the case, whether those grants would expire in 1935 or were without time limit. Business considerations of great importance to the Company, such as future refunding opera-

tions, made it highly necessary that the duration of the grants contained in the two ordinances should not be left undetermined.

The trial court in its memorandum opinion, in referring to the grants contained in the two ordinances, said: "No one doubts that the easements, whatever their duration or terms may be, are property, and property of value, and that they inhere in and are indispensable to the other property rights of the company. They lie in grants and are the foundation of all other rights. They are of such import, both to the company and the public, that, having been put in issue, I think their duration and value should be now adjudicated, though it be finally held, as the master held, that their value cannot be brought into the rate base."

We think that the conclusion of the trial court to make a finding in reference to the duration of the grants contained in these ordinances was justified.

The finding made is given above as paragraph VIII of the final decree. The sections of the ordinances there construed are as follows:-

Section 1 of Ordinance No. 3 of 1885: "That the right of way be and the same is hereby granted to the Denver Electric & Cable Railway Company, it successors and assigns, to build, operate, and maintain a single or double track railway, with switches, turnouts, side tracks and other appliances necessary for the operation of the same, in, along and across the streets of the city of Denver, said railway to be operated by power transmitted by use of electricity or by cable."

Section 1 of Ordinance No. 36 of 1888: "That the right of way be, and the same is hereby granted to the Denver City Cable Railway Company, a corporation organized and existing under and by virtue of the laws of the state of Colorado, and to its successors and assigns, to build, equip, maintain, own and operate a single or double track of cable railway, with switches, turnouts, side tracks and other appliances necessary for the operation of the same, in, along and across all the streets, avenues, viaducts and bridges of the city of Denver, save and excepting Fifteenth street for its entire length, Colfax avenue from and including its intersection with Fifteenth street eastward to the eastern corporate limits of the city, and Broadway from and including the intersection of Colfax avenue to the southern city limits."

The Ordinance of 1885 also contained a clause reserving to the City "all legislative, police, powers, and functions with respect to

the streets that may be used and occupied by said company that it had before the passage of this ordinance." The Ordinance of 1888 contained a similar reservation. Both ordinances contained provisions as to grades, paving, rate of speed, culverts, etc.

It is plain that each of these two ordinances, when their provisions are considered respectively, contained both grants of easements and regulations of a police nature. The provisions covering rights of way in the streets fell within the former class; the provisions as to fares fell within the latter class. Such combination ordinances are not uncommon. See Pittsburg, C. & St. L. R. Co. v. Hood (C. C. A.) 94 F. 618.

[12] The language of the ordinances does not suggest any exclusive or monopolistic grants. On the contrary, it appears that the grantees in the two ordinances were two distinct companies. That these grants were not mere licenses at the will of the City has been set at rest by the decisions in the Mercantile Trust Co. Case, supra, and in Denver Tramway Co. v. Londoner, 20 Colo. 150, 37 P. 723. In making these grants the City acted in its proprietary capacity as owner of the streets. Illinois Trust & Savings Bank v. City of Arkansas City, 76 F. 271, 282, 34 L. R. A. 518 (C. C. A. 8). When acting in a proprietary capacity, the city is subject to many of the same restrictions as a private individual, including estoppel. See St. Cloud Public Service Co. v. City of St. Cloud, 265 U. S. 352, 44 S. Ct. 492, 68 L. Ed. 1050; Louisville v. Cumberland Tel. Co., 224 U. S. 649; City of Denver v. Mercantile Trust Co., supra; Illinois Trust & Savings Bank v. City of Arkansas City, supra; Safety Insulated Wire & Cable Co. v. City of Baltimore (C. C. A.) 66 F. 140; Omaha Water Co. v. Omaha, 147 F. 1, 12 L. R. A. (N. S.) 736, 8 Ann. Cas. 614 (C. C. A. 8).

[13] These grants by their terms were unlimited as to duration, and contained the power of assignment. Under such circumstances, the grants were without time limit, in the absence of constitutional or statutory limitations.

In Northern Ohio Traction & Light Co. v. State of Ohio ex rel. Pontius, 245 U. S. 574, 38 S. Ct. 196, 62 L. Ed. 481, L. R. A. 1918E, 865, the court had under consideration the easement or franchise granted to an electric railway. As stated by the court: "The line was constucted under resolution by the board of county commissioners, Stark county, passed February 22, 1892, which granted to William A. Lynch, and such rail-road corporation as he might cause to be incorporated for that purpose, the right to locate, construct, maintain, and operate an electric railroad along the state highway without specifying any limit of time."

In 1913 the commissioners declared by resolution "that said term of said grant and conveyance be terminated on this date." Suit was brought in the state court, and the Supreme Court of Ohio (93 Ohio St. 466, 114 N. E. 53) adjudged that the railway company be ousted from the exercise and use of its rights, privileges, and franchises in the operation of its electric railroad. The Supreme Court of the United States in reversing the judgment said:

"Beyond serious doubt, under Constitution and statutes of Ohio in 1892 county commissioners had power to grant franchises over public roads valid for 25 years, if not perpetually. Nothing said by the state courts prior to East Ohio Gas Co. v. Akron [81 Ohio St. 33, 90 S. E. 40, 26 L. R. A. (N. S.) 92, 18 Ann. Cas. 332], in 1909, is cited which intimates that grants, without specified limit of time, were revocable at will. Evidently this was not the settled view in 1903 when the Circuit Court distinctly adjudged that accepted ordinances by a city between 1861 and 1873, authorizing construction and operation of street railways, silent as to time, created perpetual rights, subject however to revocation by the General Assembly. State ex rel. Taylor v. Columbus Ry. Co. (1903) 1 Ohio C. C. (N. S.) 145. * * * Where there are no controlling provisions in state Constitution or statutes and no prior adjudication by its courts to the contrary, we have distinctly held that franchises like the one under consideration are contracts not subject to annulment as here undertaken."

In Ohio Public Service Co. v. Ohio ex rel. Fritz, 274 U. S. 12, 47 S. Ct. 480, 71 L. Ed. 898, an ordinance dated February 1, 1892, was involved, which read as follows:

"Sec. 1. That Aurel P. Gans and Melville D. Wilson of Canal Dover, Ohio, their associates, successors, and assigns, are hereby authorized and empowered to use the streets, lanes, alleys, and avenues of the village of Orrville for the purpose of erecting, maintaining, and operating electric light wire mains and apparatus complete for the distribution of electricity for light, heat, and power."

The state courts held the franchise under the ordinance was revocable ten years after the date of the grant. In reversing the judg-

ment of the state court the Supreme Court said:

"In Northern Ohio Traction [& Light] Co. v. [State of] Ohio [ex rel. Pontius] 245 U. S. 574, 38 S. Ct. 196, 62 L. Ed. 481, L. R. A. 1918E, 865, we pointed out the state of the law in Ohio during 1892. It is plain enough from what was there said that in our view the franchise originally granted by the village of Orrville was for an unlimited time and not subject to termination at the mere will of the grantor."

In City of Owensboro v. Cumberland Telephone & Telegraph Co., 230 U. S. 58, 33 S. Ct. 988, 57 L. Ed. 1389, the ordinance involved, dated December 4, 1889, read, so far as here material, as follows:

"That the Cumberland Telephone Company, its successors and assigns, is authorized and hereby granted the right to erect and maintain upon the public streets and alleys of said city any number of telephone poles of proper size, straight and shaved, smooth, set plumb, and kept erect, and any number of wires thereon, with the right to connect such wires with the building when telephone stations are established, provided such poles shall be located and kept so as not to interfere with the travel upon said streets or alleys or the substantial use thereof by the inhabitants of said city."

The city council having passed an ordinance in 1909 to compel the removal of the poles and wires from the city streets and alleys, suit was brought to restrain the city The trial court granted the injunction. The Supreme Court in affirming the judgment said:

"That the grant in the present case was not a mere license is evident from the fact that it was upon its face neither personal, nor for a temporary purpose. The right conferred came from the state through delegated power to the city. The grantee was clothed with the franchise to be a corporation and to conduct a public business, which required the use of the streets, that it might have access to the people it was to serve. Its charges were subject to regulation by law and it was subject to all of the police power of the city. * * * The grant by ordinance to an incorporated telephone company, its successors and assigns, of the right to occupy the streets and alleys of a city with its poles and wires for the necessary conduct of a public telephone business is a grant of a property right in perpetuity, unless limited in duration by the grant itself or as a consequence of some limitation imposed by the general law of the state, or by the corporate powers of the city making the grant."

See, also, City of Detroit v. Detroit Citizens' St. Ry. Co., 184 U. S. 368, 395, 22 S. Ct. 410, 46 L. Ed. 592; City of Owensboro v. Cumberland Telephone & Telegraph Co., supra; Boise Artesian Hot & Cold Water Co. v. Boise City, 230 U. S. 84, 33 S. Ct. 997, 57 L. Ed. 1400; Old Colony Trust Co. v. City of Omaha, 230 U. S. 100, 33 S. Ct. 967, 57 L. Ed. 1410.

The holdings in the foregoing cases that the ordinance easements or franchises were unlimited in time, do not imply that the grants were exempt from the constitutional exercise of the police power, or that they could not be revoked for nonuse or misuse. New York Electric Lines Co. v. Empire City Subway Co., 235 U. S. 179, 194, 35 S. Ct. 72, 59 L. Ed. 184, Ann. Cas. 1915A, 906; Old Colony Trust Co. v. City of Omaha, supra.

Turning to the case at bar with these principles in mind, we find that the wording of the Ordinances of 1885 and 1888 is similar to that of the ordinances considered in the cases cited; i. e., no time limit is affixed to the grants.

[14] But it is contended by the City that constitutional provisions of the state of Colorado forbade the granting of easements without time limits. The following are pointed out:

Article 2, § 11, Constitution of Colorado: "That no ex post facto law, nor law impairing the obligation of contracts, or retrospective in its operation, or making any irrevocable grant of special privileges, franchises or immunities, shall be passed by the general assembly."

Article 5, § 25, Constitution of Colorado: "The general assembly shall not pass local or special laws in any of the following enumerated cases, that is to say: * * * Granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever."

In these constitutional provisions we find no express prohibition against the granting by the City of easements such as are contained in the Ordinances of 1855 and 1888 without limit of time; and it is to be noted that the ordinance involved in the Old Colony Trust Co. Case, supra, was held to be without time limit, although the Constitution of the state of Nebraska contained the following provisions, which are substantially the same as the provisions of the Colorado Constitution above set out:

Article 1, § 16, Constitution of Nebraska: "No bill of attainder, ex post facto law, or law impairing the obligation of contracts, or making any irrevocable grant of special privileges or immunities, shall be passed."

Article 3, § 15, Constitution of Nebraska: "The Legislature shall not pass local or special laws in any of the following cases, that is to say: * * * Granting to any corporation, association, or individual any special or exclusive privileges, immunity, or franchise whatever."

It is claimed, however, by the City that judicial decisions of the state of Colorado have held that such grants could not be made by the City. Denver & Swansea Ry. Co. v. Denver City Ry. Co., 2 Colo. 673, is cited. That case was decided in 1875 by the Supreme Court of the territory of Colorado. It involved the question of the power of the legislative assembly of the territory of Colorado under the Acts of Congress of March 2, 1867 (14 Stat. 426), and June 10, 1872 (17 Stat. 390), to grant the right to construct and operate a street railway in a city. The case also involved the question of the power of the city of Denver over the same subject-matter under its charter of February 9, 1866, and the amendment of February 13, 1874. The case necessarily did not involve in any way the construction of the Constitution of the state of Colorado adopted in 1876, nor the construction of the charter provisions of the city of Denver contained in the charter amendment of 1883, nor the construction of the incorporation laws of Colorado of 1877. For these reasons the rulings in the case are inapplicable to the case at bar.

The case next cited is Virginia Cañon Toll Road Co. v. People ex rel. Vivian, 22 Colo. 429, 45 P. 398, 37 L. R. A. 711 (1896). This was a quo warranto proceeding. The holding in this case was that a toll road company, organized as a corporation under the statutes of the state for the life of 20 years without power of renewal, could not transfer to another toll road company organized expressly for the purpose of acquiring all the rights, franchises, and property of the first company, the right to continue to collect tolls after the expiration of the 20 years. The court in its opinion said:

"It is significant in this connection that the Legislature has made no provision for the renewal of the corporate life of toll road companies, or provided for the transfer of their franchises or property to another corporation. Life insurance companies organized under the statutes of our state have perpetual succession (Gen. Stats. 1883, § 238);

railroad companies may continue to exercise their franchises for the period of 50 years, with a provision for their renewal (Gen. Stats. 1883, § 334); ditch and reservoir companies may have their term of incorporation continued and extended for 20 years beyond the original term (Session Laws 1891, p. 96); but there is no provision of any kind for the renewal of the corporate existence of a toll road company; and this, we think, is another indication of the legislative intention not to allow such companies, themselves, or by their grantees, to exercise this sovereign power beyond the original term of 20 years, as well as a legislative declaration that the power to continue the exercise of such franchise ceases when corporate existence ceases, unless there is a provision for renewal."

The ruling in the case is wholly inapplicable to the case at bar.

Another case cited is Leadville v. Leadville Sewer Co., 47 Colo. 118, 107 P. 801 (1909). This was a suit for injunction against the city to prevent it from interfering with the operation of certain sewers in the city. The sewers were and for many years had been operated by a private corporation, the sewer company, under permits from the city. The permits were finally revoked and the sewer company was notified not to make further excavations or collect further charges. The court below granted an injunction. The Supreme Court in its opinion said:

"No ordinance was passed granting or attempting to grant to the appellee any franchise, and the only right it had (if any), for its use of the streets and alleys was secured through the permits, which were indefinite as to time."

And again:

"By granting the permit to construct the sewers, the city received nothing, the appellee promised nothing. After the permits were granted, the appellee, having made no promise or agreement, need not have constructed any sewers at all, while the plea of estoppel, if sustained, would entitle the appellee to all the privileges of a perpetual franchise (including the perpetual right of digging up the streets to disconnect consumers); rights which the Legislature itself could not grant, being contrary to the provisions of article 2, § 11, of our bill of rights, which provides, 'that no * * * law * * * making any irrevocable grant of special privileges, franchises or immunities, shall be passed by the General Assembly.'"

The bases of the decision were: (1) That

there never was any contract between the city and the sewer company; the permits on their face showed this. (2) Under such circumstances the plea of estoppel, if sustained, would amount to giving the sewer company a perpetual franchise (noncontractual and without consideration), which would be contrary to the Colorado Constitution.

In the case at bar the situation is entirely different. The City by the Ordinances of 1885 and 1888 granted the easements, and in consideration thereof it was provided as follows:

"That the said company, its successors or assigns, shall begin to construct its railway within six months and shall have at least two miles of railway in operation within two years from the date of the passage of this ordinance." Ordinance of 1885, § 7.

"That said the Denver City Cable Railway Company, its successors and assigns, shall begin to construct said railway within four months from the date of passage of this ordinance, shall have two miles of cable railway constructed and within operation within eighteen months from the date of the passage of this ordinance." Ordinance of 1888, § 6.

In the case at bar, therefore, there was a consideration for the grant, and therefore the question which arose in the Leadville Case is plainly distinguishable. It may be added in regard to the opinion in the Leadville Case, that seven judges sat in the case. One wrote the opinion, in which a second apparently concurred in full; three others concurred specially, stating their reasons, but without making any reference to any constitutional question; two others dissented. Doubt therefore exists whether a majority of the court thought that a constitutional question was involved, and, if so, what the view of the court was relative thereto.

Another case cited by the City is Thomas v. City of Grand Junction, 13 Colo. App. 80, 56 P. 665 (1899). This was a decision of an intermediate court, involving the charter powers of a city relative to the purchase of water works. The case involved no constitutional question; and, if it had, the court would have had no final jurisdiction to decide it. See Henderson v. Collier & C. Lith. Co., 2 Colo. App. 251, 30 P. 40; Carlile v. Hurd, 3 Colo. App. 11, 17, 31 P. 952.

Still another case cited by the City is Public Service Co. of Colorado v. City of Loveland, 79 Colo. 216, 245 P. 493 (1926). This was an eminent domain proceeding by the city to condemn an electric lighting plant. The plant had been constructed by a company under an ordinance granting to the company the right to construct and maintain the same, and to have rights of way through the streets and alleys, for a period of 25 years. That period had not expired when the condemnation suit was commenced. One of the questions discussed was whether the city had the power to condemn. After setting out the constitutional and statutory provisions relative to the matter, the court held that the city had such power, and said:

"There was no destruction of any vested right in this. Whatever rights the company or its predecessor acquired were obtained in contemplation of and subject to the constitutional and statutory provisions, sufficient to put everyone on notice that such rights might be exercised. The Legislature is also inhibited from making any irrevocable grant of special privileges, franchises or immunities. Const. Colo. art. 2, § 11."

There was no question involved as to the right of a city to grant an easement or a right of way without time limit. The franchise involved was for 25 years only. The question involved was whether franchises granted by the city, with or without time limit, were subject to condemnation by the city. Irrevocability and duration as applied to a grant under an ordinance were held, by inference at least, to have no connection with each other.

[15] It is thus seen that in no one of the cases cited by the City in which article 2, § 11, of the Constitution of the state of Colorado is referred to, is it held that a city may not make a grant to a public utility of an easement in the streets without time limit. Furthermore, even if those cases did so construe that constitutional provision, yet, inasmuch as they were all decided after the rights in the case at bar had accrued under the Ordinances of 1885 and 1888, such decisions would not be binding upon the federal courts, but those courts could exercise their own independent judgment on the question involved. Folsom v. Township 96, 159 U. S. 611, 16 S. Ct. 174, 40 L. Ed. 278; Carroll County v. Smith, 111 U. S. 556, 4 S. Ct. 539, 28 L. Ed. 517; Burgess v. Seligman, 107 U. S. 20, 33, 2 S. Ct. 10, 27 L. Ed. 359; Thompson v. Perrine, 103 U. S. 806, 26 L. Ed. 612; Township of Pine Grove v. Talcott, 19 Wall. 666, 22 L. Ed. 227; Mothersead, State Bank Com'r of Oklahoma, v. United States Fidelity & Guaranty Co. (C. C. A. 8) 22 F.(2d) 644.

We agree with the conclusion of the trial court that neither in the Constitution of Colorado, nor in its statutes, nor in the char-

ter of the city of Denver, are to be found any provisions prohibiting grants without time limit, such as were contained in the Ordinances of 1885 and 1888. We also agree with the conclusion that the grants of rights of way and easements contained in the Ordinances of 1885 and 1888 must be construed to be without time limit, in accordance with the ruling in Old Colony Trust v. City of Omaha, and other kindred cases, supra.

The finding relative to the value of the grants under the Ordinances of 1885 and 1888 was not necessary to a determination of the cause, as the value was not included in the rate base. We see no important reason for its inclusion in the decree; and since the City contends that it is prejudicially affected by the finding, and has objected to the inclusion of the finding in the decree, we think it should be eliminated. In other respects the decree is approved.

Various other questions have been discussed by counsel. They have been considered, but do not require special mention.

The decree is modified as above indicated, and, as so modified, is affirmed.