**MOFFAT TUNNEL IMPROVEMENT DIST. et al. v. DENVER & S. L. RY. CO.**

**DENVER & S. L. RY. CO. v. MOFFAT TUNNEL IMPROVEMENT DIST. et al.**

Nos. 260, 261.

Circuit Court of Appeals, Tenth Circuit.

Nov. 29, 1930.

Norton Montgomery and Horace N. Hawkins, both of Denver, Colo. (Erskine R. Myer, of Denver, Colo., on the brief), for Moffat Tunnel Improvement Dist. and Moffat Tunnel Commission.

Clayton C. Dorsey and Gerald Hughes, both of Denver, Colo. (Elmer L. Brock, of Denver, Colo., on the brief), for Denver & S. L. Ry. Co.

Thomas H. Gibson, of Denver, Colo., amicus curiæ for City and County of Denver.

James Grafton Rogers, of Denver, Colo. (Harold H. Healy, of Denver, Colo., on the brief), amicus curiæ for Denver Chamber of Commerce, Retail Merchants' Bureau, Moffat Tunnel League, Presidents' Round Table, and Lions Club of Steamboat Springs, Colo.

F. R. Carpenter, of Hayden, Colo., amicus curiæ for Routt County Taxpayers' Ass'n, and Joseph J. Jones, a taxpayer of Moffat County, Colo.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge.

This litigation deals with a lease of the Moffat Railroad Tunnel executed on January 6, 1926, by the Moffat Tunnel Improvement District to the Denver and Salt Lake Railway Company, commonly called the Moffat Railway. The appellants in No. 260 and appellees in No. 261 are the District and its governing body, the Moffat Tunnel Commission, and for brevity will be hereafter referred to as the "District". The Railway.

Company is the appellee in No. 260, and the appellant in No. 261, and will be referred to as the "Railway." The District was created by an Act of the Colorado Legislature passed at a special session in 1922, and a résumé of that Act is on the margin.[1]

[1] Résumé of the Moffat Tunnel Law.

(Ch. 2, Session Laws of Colorado, 1922)

Section 1 declares that "to provide for an avenue of communication by means of a transportation tunnel through the Continental Divide at or near James Peak will reduce the barrier which now separates the western portions of this State from commercial intercourse with the eastern portion thereof, will facilitate communication all seasons of the year, will promote the health, comfort, safety, convenience and welfare of the people of the State of Colorado, and will be of especial benefit to the property within the boundaries of the improvement district hereinafter created."

Section 2 creates an improvement district, and defines the territory therein contained. Section 3 provides that if a remonstrance is signed by the owners of fifty per cent of the valuation of the property in the District, the improvement shall not be made. Section 4 vests the management of the District in a board of five members to be known as the "Moffat Tunnel Commission" and provides for their selection, compensation and tenure of office. Section 5 provides for the organization of the board. Section 6 places upon the board the duty of constructing a tunnel that may be used for "standard gauge railroads, for the transmission of power and for the use of telephone and telegraph lines, for the transportation of water and for the transportation of automobiles and other vehicles," and fixes the location thereof.

Section 7 provides for the adoption of plans and specifications, advertisement and letting of contracts for construction, and that "In case a contract or contracts cannot be let satisfactory to said Board for the construction of any part of said work, then the Board is authorized to carry on under its own direction the construction of all or any part of said work, as it may deem advisable."

Section 8 empowers the board to employ engineers, assistants and employes, and counsel; gives power to acquire a tunnel site and such other lands and approaches as may be necessary, and confers a dominant power of eminent domain. Power is granted to "construct, preserve, operate and maintain, or contract for the construction, preservation, operation, and maintenance of said tunnel and its approaches"; and "to enter into and execute all contracts, leases and other instruments in writing necessary or proper to the accomplishment of the purposes of this Act." It is then provided that "The Board is hereby vested with all powers necessary and requisite for the accomplishment of the purposes for which this District is organized and capable of being delegated by the General Assembly of the State of Colorado; and no enumeration of particular powers hereby granted shall be construed to impair any general grant of power herein contained, nor to limit any such grant to a power or powers of the same class or classes as those so enumerated."

Section 9 is as follows:

"The Board shall have the power to enter into a contract or contracts for the use of said tunnel, its approaches and equipment, with persons and with private and public corporations, and by said contracts to give such persons or corporations the right to use said tunnel, its approaches and equipment for the transmission of power, for telephone and telegraph lines, for the transportation of water, for railroad and railway purposes, and for any other purpose to which the same may be adapted, no such contract to be for a longer period than ninety-nine (99) years, and the tunnel shall be put to the larg-

In very broad outline, the litigation was precipitated by a notice from the District to the Railway, served on January 30, 1929, that the Railway was in default for nonpayment of rent, and electing to forfeit the lease if the rental was not paid in twenty-four hours. The notice was predicated on the theory that the Railway was obligated to pay a rental based on two-thirds of the ultimate cost of the tunnel, $15,470,000, rather than the rental set out in the contract, which was based on two-thirds of the bonds then outstanding, $9,220,000. The Railway promptly brought this action to enjoin such forfeiture and to quiet its title to the leasehold estate. The District answered that the lease was illegal and void for several reasons, some of which will be noticed later; and in the alternative, that certain provisions, particularly the amount of rental to be paid, were illegal; that the rental provision was unfair and inequitable, and that instead of paying two-thirds of the principal and interest of $9,220,000, as set out in the contract, or two-thirds of $15,470,000, as set out in the notice, the Railway should pay a reasonable rental, alleged to be the principal and interest on 87 per cent. of $15,470,000. The answer further alleged that in executing the lease the parties had been mutually mistaken in their estimate as to the ultimate cost of the tunnel and as to the probable time of its completion, and the relative value of the railroad use to other uses. By way of counterclaim the District prayed that the court decree the lease to be void, or, in the alternative,

est possible number of uses consistent with the purposes for which such improvements are constructed. In making such contract or contracts and providing for payments and rentals thereunder, the Board shall determine the value of the separate and different uses to which the tunnel is to be put, and shall apportion the annual rentals and charges as nearly as possible according to the respective values of such uses. No such contract shall be made with any person or corporation unless and until such person or corporation shall bind himself or itself to pay as rental therefor an amount determined by the Board and specified in the contract, which shall be a fair and just proportion of the total amount required to pay interest on the bonds provided for in this Act, plus a just proportion of the amount necessary for their retirement, and plus the cost of maintenance of the tunnel, its approaches and equipment. The Board may require any of such contracts to be entered into before beginning the construction of said tunnel or before the expenditure of funds under the provisions of this Act, if in its judgment it is deemed expedient.

"There shall be no monopoly of the use of said tunnel and its approaches by any one use, or by any person or corporation, private or public, in respect to the several uses, and the Board may continue to make separate and additional and supplemental contracts for one or more uses until, in the judgment of said Board, the capacity of the tunnel and approaches for any such use has been reached. When such capacity has been reached contracts for the use of said tunnel shall be given preference in regard to such uses according to their priority, and subsequent contracts shall be subject to all existing and prior contracts. The Board shall have the power to prescribe regulations for the use of such tunnel by the parties to contracts for such use, or any of them, and to hear and determine all controversies which may arise between such parties, under such rules as the Board may from time to time promulgate; and all contracts shall expressly reserve such power to the Board. All contracts may be assigned or sub-leased, provided that the original contracting party shall not be thereby relieved of any obligations under said contract or lease. Subsequent leases or contracts for the same use must provide for the reimbursement to the prior users of an equitable proportionate amount theretofore paid for the retirement of bonds, including interest thereon, said amount to be determined by the Board, and the judgment and action of the Board on all matters referred to in this section shall be final except as specifically in this Act limited."

Section 10 authorizes the issuance of bonds of the District in an amount not exceeding $6,720,000, the proceeds to be used for the construction of the tunnel and expenses incident thereto.

Section 11 declares:

"It is hereby expressly declared that the special benefits accruing to the real estate in said District to be assessed are in excess of the cost of the improvements herein provided for and in excess of the assessments herein provided for against said real estate."

Power is given to appraise the benefits, and to levy special assessments in proportion to such benefits, "for the purposes provided in this act." 

Section 12 exempts public property from assessment.

Section 13 provides:

"If the revenues from the use of said tunnel, its approaches and equipment are not sufficient to pay the interest in any year as it becomes due on the bonds issued under the provisions of this Act, and to provide for the retirement of said bonds at maturity and for the purpose of paying the expenses of said Board and the maintenance of said tunnel, its approaches and equipment, then and in order to prevent the occurrence of a deficit it shall be the duty of the Board to levy special assessments annually if necessary in the manner hereinbefore provided, sufficient in amount to provide sufficient money to pay the interest on said bonds as it becomes due and to provide for the retirement of said bonds at maturity."

Sections 14 to 18, inclusive, provide for the procedure of assessments and appeals therefrom, and for the levy and collection of taxes upon such assessments.

Section 19 provides:

"The said tunnel, it approaches, equipment and appurtenances shall be owned perpetually by the Moffat Tunnel Improvement District, and shall remain forever a public improvement for public transportation and communication, and after the bonds which may be issued under the provisions of this Act are fully paid, it shall then be maintained and operated as provided by law."

Section 20 provides:

"This Act being necessary to secure and preserve the public health, safety, convenience and welfare, and being necessary for the prevention of loss of life and property and for the progress of the people of said Improvement District, shall be liberally construed to effect the purposes of this Act."

Section 21 provides that if any part of the act shall be declared invalid, such decision shall affect only the part so declared to be invalid.

that the Railway pay rental at the rate of $850,000. per annum, instead of in accordance with the schedule attached to the lease —a sliding scale, which for the first fifteen years is approximately $355,000 a year. The Railway replied, joining issue and setting up facts relied on as an estoppel. After a trial of considerable length, the court below found there had been no mutual mistake, and that the rental was reasonable and fair; sustained the lease in its main provisions, but struck out certain subordinate provisions which it found to be illegal but severable. On a collateral issue as to whether any rent was due from February 14, to February 26, 1928, the trial court found against the Railway. Both parties appeal.

Several taxpayers of the District petitioned the court below for permission to intervene, on behalf of themselves and other taxpayers of the District, in order that all objections to such lease, or theories concerning it, might be presented. Permission being granted, the interveners filed an answer, raising in part the same objections to the lease as the District, and also other objections thereto, one of which was that such political and business relations existed between certain members of the Commission and certain representatives of the Railway, as to prevent the Commission from properly representing the District in negotiating the lease, although no collusion or fraud is charged in terms. We are advised by the briefs that some evidence was introduced by the interveners in support of their answer. The trial court found that

"In the negotiations for the execution of the lease of January 6, 1926, both parties thereto acted in all good faith without undue influence of any kind on the part of the plaintiff or its attorneys, and said lease was not procured as a result of any personal, business or other relations existing between plaintiff or any of its representatives, and defendants or any of its members."

The interveners did not appeal; their evidence is not in the record, and the finding of the trial court as to the good faith of all the parties, is therefore final.

After the appeal was exhaustively briefed and argued at length in this court, other taxpayers and municipalities within the District petitioned for leave to reopen the case, to present additional briefs, and to reargue the case orally. Because the case is of direct interest to all the taxpayers of the District, and is of large public importance, this unusual request was granted. Briefs from such amici curiæ have been received and

considered. Some of the arguments in such briefs are directed at issues which have become final; others find no support in the record. Briefs are received from amici curiæ to aid the court in disposing of issues before the court; friends of the court cannot introduce new issues, nor can they supplant the body to which the legislature has delegated the control of the affairs of the District.

## Appeal in No. 260.

The parties have widely divergent conceptions as to the purpose and intent of the Moffat Tunnel Law. The District, and part of the amici curiae, construe the law as imposing a condition that the tunnels must be leased for an amount sufficient to pay for the entire cost thereof; that the taxpayers of the District must not be required to pay any part of such cost; that the real purpose of the law is to put the credit of the taxing District back of the enterprise of constructing a tunnel for the use of the Railway; that the Commission was without power to enter into leases unless the aggregate rentals were sufficient to retire the bonds and maintain the tunnels; and that if the Commission did so, the court should increase the rentals to comply with the law. The Railway and the amici curiae appearing by Mr. Rogers, on the other hand, entertain a much broader conception of the purpose of the law; they construe the law as requiring the construction of a highway for public use, and authorizing the Commission to make such leases as will enable the tunnels to be put to their fullest possible uses; they conceive that the amount of rentals received is subordinate to the larger purpose of an extensive use of the facilities of the tunnel for the public good; the Railway contends that, subject to specific limitations contained in the Act, the rentals are proper subjects of negotiation between the District and applicants for leases; Mr. Rogers claims that the statute prescribes a formula which fixes the only rental which is legal. In ascertaining the underlying purpose of the law, a glance at the history of the efforts to construct such a tunnel may be helpful.

For many years efforts had been made to provide a more direct avenue between Denver and the empire beyond the Continental Divide, and particularly northwestern Colorado. The first railroad to challenge the Rocky Mountains sought the lower passes of Wyoming, and later ones the passes of New Mexico and Southern Colorado. A transportation line across the Continental Divide at or near Denver would afford northwestern Colorado access to Denver; and, in addition,

would measurably shorten the distance between Denver and the Pacific Coast. The predecessor of the present Railway had scaled the crest just north of Denver. But the curvatures were sharp and the grades steep; transportation costs were excessive, and great difficulties were encountered in keeping the line open during the winter months. The result was expensive, interrupted and unsatisfactory service. Many years ago it was conceived that most of these difficulties could be obviated by the construction of a tunnel under the Divide, where it would be available to the Moffat Railroad. Such a tunnel would result in an outlet to the Coast if arrangements could be made for the construction of a cutoff between the Moffat line and the Denver & Rio Grande Western Railroad. But the railroad company was not able to finance the construction of such a tunnel. In 1911 an Act to issue bonds for the construction of a tunnel through James Peak was defeated on a referendum. In 1913, the electors of the City of Denver adopted an amendment to the city charter, which provided for the issuance of bonds of the city to aid in the construction of the tunnel. The Supreme Court of Colorado held that such amendment was in violation of sections 1 and 2 of article 11 of the Colorado Constitution, which provide in substance that neither the state nor any subdivision thereof may lend or pledge its credit, directly or indirectly, in aid of any private enterprise. Lord v. Denver, 58 Colo. 1, 143 P. 284, L. R. A. 1915B, 306, Ann. Cas. 1916C, 893. In 1919 a constitutional amendment for a bond issue to construct the tunnel, condemn the railroad and construct extensions thereto, was defeated at the polls.

For years prior to 1921 the Moffat Railroad, the predecessor of the present Railway, had been in receivership. By 1921 the dismantling and junking of the line seemed probable. Again there was agitation to construct the tunnel, to save the Moffat Railroad, and to preserve a public thoroughfare between Denver and the empire across the Divide. So in 1922 the legislature of Colorado was convened in Special Session, and the Act in question was passed. In enacting this statute, the legislature undoubtedly sought to avoid the constitutional objections which had defeated the 1913 amendment to the charter of Denver. That is, the proposed Act must not lend the credit of any subdivision of the state in aid of any private enterprise. It must provide for a public thoroughfare for the public welfare. So we find that section 1 of the law declares that the construction of this tunnel will promote the welfare of the people of the state, and will be of especial benefit to the property within the improvement district therein created. This statute was attacked in the courts on the ground that it violated the Colorado Constitution and the Fourteenth Amendment to the Federal Constitution. Both the Colorado Supreme Court and the Supreme Court of the United States held that the improvement was for a public use. Milheim v. Moffat Tunnel Imp. District, 72 Colo. 268, 211 P. 649; Id., 262 U. S. 710, 43 S. Ct. 694, 67 L. Ed. 1194. Both courts held that the construction of the tunnel would be a benefit to the people in the District and that it was intended to furnish an avenue or highway which should be leased to public transportation agencies, and would promote the public welfare. We must accept this as the proper construction of the law, and must reject the contention now made that the actual purpose of the law was to lend the credit of the District to the Railway.

The parties differ as to whether the statute should be strictly or liberally construed, and much space in the briefs is devoted to this difference. In construing statutes, courts are seeking for legislative intent. The legislature which passed this statute declared its intention that it "shall be liberally construed to effect the purposes of this Act." Section 8(h) of the statute vested the Commission "with all powers necessary and requisite for the accomplishment of the purposes for which this District is organized and capable of being delegated by the General Assembly of the State of Colorado; and no enumeration of particular powers hereby granted shall be construed to impair any general grant of power herein contained, nor to limit any such grant to a power or powers of the same class or classes as those so enumerated." Without such legislative mandate, a power expressly conferred upon a public agency carries with it, by necessary implication, such additional powers as are essential or reasonably necessary to give effect to the powers expressly granted. McQuillin on Municipal Corporations (2d Ed.) vol. 1, §§ 367–369. The Commission was commanded to construct a tunnel for public use, suitable for railroad use; it was authorized to lease such tunnel, subject to certain limitations. By the terms of the Act, and at common law, it was authorized to do such things as were reasonably necessary to carry out these powers.

We come now to the contention that the Commission has no power to execute a

lease for any use of the tunnel, unless the aggregate of all the rentals from all of the leases shall be sufficient to pay for the entire cost of the tunnel. This contention cannot be sustained, and this for many reasons.

In the first place, such a construction would nullify the entire purpose of the law. Obviously, no power exists to require any lessee to enter into a lease at a rental which the lessee does not care to pay. If the Commission, therefore, could not make a lease for less than a fixed rental, the result might very well be an idle and useless tunnel, an entire waste of all the moneys expended in the construction thereof. The primary purpose of the law was to construct a tunnel which should be put to the largest number of possible uses. That purpose would be thwarted if the Commission were prohibited from making a lease, excepting on terms which made it impossible to find lessees. Again, section 8 expressly confers the power upon the Commission to enter into leases, and contains no such limitation as to rental as the District contends for; the law vests the Commission with all other powers necessary for the accomplishment of the purpose of the law, and provides that the law shall be liberally construed. When the legislature has conferred such broad powers upon the Commission, there is little room for construction; and courts cannot amend statutes enacted by the legislature. The omission of any limitation upon the power to lease is more significant when it is recalled that the Act of 1919 (Laws Colo. 1919, p. 673, § 9) submitting the constitutional amendment to construct this tunnel contained apt words requiring that the rentals must equal the amount estimated "to be sufficient to pay the interest upon the bonds issued to build such tunnel, for the proper maintenance of such tunnel, and to create a sinking fund sufficient to discharge the principal of said bonds at their maturity." Furthermore, the Act contemplates that the Commission may construct the tunnel under its own direction, and without the letting of a contract therefor. The law further expressly authorizes the Commission to enter into leases before beginning the construction of the tunnel. Manifestly, a Commission which is authorized to enter into a lease before commencing work on the tunnel, and which is also authorized to construct the tunnel without a contract therefor, is not required to fix a rental predicated on cost, for the cost would necessarily be unknown at the time such lease was made. Again, the law provides that if the revenues from the uses of said tunnel are not sufficient to pay obliga-

tions of the District, the Commission is authorized to levy special assessments to meet such obligations. If the law contemplated the necessity of the revenues meeting the obligations, there would be no occasion for such provision.

In some of the briefs it is stated that the taxpayers were led to believe, before the law was passed, that no burden would be imposed upon them; that the statute proposed merely to lend the credit of the District to the Railway. If there was a misconception of the scope of the statute by the taxpayers of the District, it is to be regretted, but such misconception cannot justify the courts in misconstruing it. The statute cannot be construed as a mere lending of public credit to a private enterprise, for the Colorado Constitution expressly forbids such, and the effort to construct the tunnel in 1913 was abortive for that particular reason. Lord v. Denver, 58 Colo. 1, 143 P. 284, L. R. A. 1915B, 306, Ann. Cas. 1916C, 893. Furthermore, this very statute was construed by both the Supreme Court of Colorado and the Supreme Court of the United States as not contemplating such a lending of credit, but as providing for the construction of a public thoroughfare. It must be remembered that the statute does not *authorize* the creation of an improvement district; it *creates* it. The statute does not *authorize* the Commission to construct a tunnel; it *commands* it so to do. The statute provides it shall be inoperative if the owners of fifty per cent of the property in the District remonstrate; they did not. The law having been held to be valid, nothing remains for the courts but to construe it. It might have been better if the statute had provided that work upon the tunnel should not start until a lease had been made; but it does not. Consider the situation when this lease was made: The Commission, responding to a statutory mandate, had proceeded to construct the tunnel. The Commission could not force the Railway to enter into a lease; neither could it neglect its duty to construct the tunnel. The District had incurred obligations of more than nine million dollars, and millions had been expended in construction before it was able to agree on terms with the Railway. There was no other offer for the railroad use, and in the nature of things, no other offer could be expected. The Commission was put to the hard choice of making such a contract as was acceptable to the Railway, or of letting the tunnel lie idle. The responsibility of putting it to such a choice rests upon the legislature and the taxpayers who did not remonstrate. To let

the tunnel lie idle was unthinkable; not only would the burden on the taxpayers be greatly increased, but there would be no outlet to the western empire, which was the underlying purpose of the statute. It may be that a lease on better terms could then have been negotiated; it may be otherwise. We do not know, and furthermore cannot inquire, for the decision of the Commission to make the lease was within its power, and is not subject to judicial review, if the conditions of the statute were complied with.

■■ Without pursuing the matter further, we conclude that the law provided for the construction of a public avenue or highway; that incidental to such public purpose, the law authorized the District to make leases for the various uses of the tunnel, subject to specific limitations, such as the length of the term and as to monopoly, which will be hereafter noticed. We conclude further that in the making of such leases, the District was acting in a proprietary capacity and is subject to the same restrictions as a private individual. Griffin v. Oklahoma Natural Gas Corporation (C. C. A. 10) 37 F.(2d) 545; City and County of Denver v. Denver Tramway Corporation (C. C. A. 8) 23 F.(2d) 287.

Coming now to the lease, executed on January 6, 1926, a summary of which is on the margin.[2] That lease recites the issuance of Moffat Tunnel Bonds in the sum of $6,720,000 and Moffat Tunnel Supplemental Bonds in the sum of $2,500,000; the lessee agrees to pay as rental, 66⅔ per cent. of the installments of the principal and interest "of the above described Moffat Tunnel Bonds and Moffat Tunnel Supplemental Bonds." A schedule of rentals to be paid is attached to the lease, setting out in dollars and cents the amounts to be paid each six months. In short, the amount of rental to be paid, and the time of payment, is set out with the utmost exactness.

■ Is this lease void in its entirety? Upon the first submission of this case, that question was not before us. The record discloses such an issue, but in the brief of the District that issue was expressly abandoned. Doubtless concluding that if the lease were set aside, the District would be in even worse position to negotiate a lease than it was in 1926, the brief of the District assured us that "We are not contending, however, that by reason of the illegality we have mentioned and that we have assigned as error on this appeal, voids the contract, but only contend that the contract is illegal as to the rental provisions contained in it, and it is our further contention that a court of equity in a case of this kind should hold the contract not to be void, but illegal as to those parts which

---

[2] The Moffat Tunnel Railroad Lease.

Dated January 6, 1926.

The lease recites the organization of the District and the Commission; that the District has issued Moffat Tunnel Bonds in the sum of $6,720,000 and Moffat Tunnel Supplemental Bonds in the sum of $2,500,000; that the District has been engaged in the construction of such a tunnel since the latter part of 1923, "and has estimated and does now estimate" that the railroad tunnel will be completed by January 1, 1927. It recites that the District has constructed two separate tunnels, a railroad and a water tunnel, and that the lessee "for itself and its successors, assigns, sublessees and legal representatives, has made application to said District to lease the Railroad Tunnel for the purpose of using the same in connection with the railroad and properties of the present The Denver and Salt Lake Railroad Company, for operating trains and transporting freight and passengers therein, thereon and therethrough," and that the District is desirous of entering into such lease. That, therefore, in consideration of $100, and the covenants of the parties, the District "Hereby Leases, Lets and Demises to the Party of the Second Part, its successors, assigns, sublesses and legal representatives" the railroad tunnel, together with its approaches and equipment, for the term of fifty years, together with an option to renew the same for forty-nine years. In consideration whereof the lessee makes certain agreements set out in Article I, among which are:

"The Railway Company, its successors, assigns, sub-lessees and legal representatives, hereby agree during the time it or they may own and operate the properties of the present The Denver and Salt Lake Railroad Company and use said Railroad Tunnel under the terms of this Contract and Indenture of Lease, to pay rental for said Railroad Tunnel

and the property, premises rights, and appurtenances herein leased as follows:

"To pay to the District, or to its duly authorized fiscal agents and/or depositaries sixty-six and two-thirds per cent (66⅔%) of the installments of the principal of the above described Moffat Tunnel Bonds and Moffat Tunnel Supplemental Bonds, as they mature according to their terms, during any period that the Railroad Tunnel is used by the Party of the Second Part, its successors, assigns, sub-lessees, and legal representatives under this Contract and Indenture of Lease, and sixty-six and two-thirds per cent (66⅔%) of the interest on said Moffat Tunnel Bonds and said Moffat Tunnel Supplemental Bonds, which accrues after the date when the Railroad Tunnel, approaches, equipment and leased property, are completed and ready for use by Party of the Second Part * * * [setting out time of payments]. * * * The above described payments and' those provided in Article I, Section 3, are more fully set forth in Exhibit 'C' hereto attached and made a part hereof." Article I, § 1.

The lessee agrees to maintain the tunnel; and to pay two-thirds of the cost of maintaining the Commission not exceeding the sum of $18,000 per year. The lessee agrees that if the Commission shall find it necessary to incur an indebtedness in addition to the Moffat Tunnel Bonds and the Moffat Tunnel Supplemental Bonds, or to levy and collect an assessment or assessments, the proceeds of which indebtedness or assessments shall be expended on the railroad tunnel, that it, the lessee, will pay the interest on such indebtedness which accrues after the total principal and interest on the Tunnel and Supplemental Bonds have been paid in full, as the same accrues, and to repay to the District the principal amount of such indebtedness in not less than ten equal installments beginning January 1, 1974; if the proceeds of such additional

are illegal." Like assurance was made on oral argument. Statements of counsel, in brief or argument, may narrow the issues. Corporation Commission v. Lowe, 281 U. S. 431, 50 S. Ct. 397, 74 L. Ed. 945; Clark v. Poor, 274 U. S. 554, 47 S. Ct. 702, 71 L. Ed. 1199; Reading Co. v. United States, 268 U. S. 186, 45 S. Ct. 469, 69 L. Ed. 907. Briefs of amici curiæ undertake to raise the question, but since the legislature has imposed the responsibility of the District on the Commission and not upon amici curiæ, such contentions were without the issues then between the parties. But without explanation or apology, the Commission in its last brief reverses its position and contends that the entire lease is void. On oral argument, it is

contended that a party ought to be permitted to recede from a legal position if later so advised. But the situation presented here was one of election; if the District was right on the merits, it had a right to rescind the contract, or affirm it and undertake reformation. 13 C. J. 380. For reasons that seemed sufficient, it chose not to rescind. It is not at all clear that it can later otherwise elect. But because of the public nature of the case and because the Railway on oral argument has expressly waived its right to rely on such election in order that a decision might be reached on the merits, we pass to the various contentions that the entire lease is void and find them to be entirely without merit. The claims of invalidity are many and in some

---

indebtedness are expended for the joint improvement of the railroad and the water tunnel, the lessee agrees to pay two-thirds of such indebtedness in the same manner; but "in no event and under no circumstances is the Party of the Second Part to pay or repay a principal amount herein described in excess of $1,000,000 and/or interest on said principal amount in excess of 6% per annum after the accrual dates herein fixed." Article I, §§ 2 and 3.

The lessee agrees to keep the tunnel insured and in case of damage or destruction by fire, to rebuild and restore said property destroyed to the extent of the proceeds of such insurance policies; that it will pay all claims or damages which may result from its operation, maintenance or repair of the tunnel. The right is reserved in the District to declare the lease terminated in the event of failure to pay rent, or breach of any other covenant of the lessee, upon six months' written notice. Article I, §§ 4 to 8.

The District makes certain agreements, set out in Article II, among which are:

That it has, in conformity with the law, "determined the value of the use of said Railroad Tunnel for railroad purposes, and purposes incidental thereto, and has by said resolution determined and hereby determines, that the proportion of the value of the use of said Railroad Tunnel for all railroad purposes, compared with the value of all other uses for which the Tunnel as a whole, and including the Water Tunnel, is adapted and available, is sixty-six and two-thirds per cent (66⅔%) of the value of the total uses for which said Tunnel as a whole, and including the Water Tunnel, is adapted and available." Article II, § 1.

That if it should prescribe rules for the use of said railroad tunnel by any other person entitled thereto, that such rules will protect the rights and priorities of the lessee from interference, hindrance, damage, inconvenience or delay. Article II, § 2.

That if the leased property is not available for use by January 1, 1928, the lessee shall have the right to complete the railroad tunnel and shall have credit for any expenditures made therefor. Article II, § 8.

The District agrees that it will not enter into any other lease with any person or corporation for the use and enjoyment of said railroad tunnel for a period of less than ten years, excepting upon the written consent of the lessee. Article II, § 10.

Certain "Mutual Covenants and Agreements" are contained in Article III, among which are:

That if the tunnel shall be rendered unfit for use for a period of thirty days or more by unforeseen catastrophe, unavoidable accident, or certain other causes, that the rental shall be suspended; that the cost of repairing said tunnel shall be borne in the first instance by the District, and shall be repaid (up to $1,000,000) by the lessee in installments commencing January 1, 1974. Article III, § 1.

Section 2, article III, reads:

" * * * That, subject to the prior and preferen-

tial rights of the Party of the Second Part, its successors, assigns, sub-lessees and legal representatives, under this Contract and Indenture of Lease, the Party of the First Part hereby reserves the right as in said Moffat Tunnel Act provided, and if the total capacity or use of said Railroad Tunnel is not then being used and required by the Party of the Second Part, to enter into a Lease or Leases with the owner, or owners, of any other railroad for the use of said Railroad Tunnel hereby leased, under the express conditions and agreements, however, that said subsequent leases shall never be upon more favorable rental payments, including the equitable and proportionate amounts of the payments on account of principal and interest on bonds issued and outstanding, or other terms and conditions including the maintenance and operation of the Railroad Tunnel and equipment connected therewith, insurance, betterments, improvements or replacements, whether made by either of the parties hereto, or other obligations or burdens, privileges or advantages contained in this lease, than are imposed upon or given to the Party of the Second Part under this Contract and Indenture of Lease.

"If the party of the Second Part, prior to the time that any junior or subsequent lease shall be made, shall have expended any sums for betterments or improvements of the Railroad Tunnel and/or the equipment connected therewith, or shall have paid any part of the principal of the Moffat Tunnel Bonds or Moffat Tunnel Supplemental Bonds, as provided in Paragraph I, Article I, of this Contract and Indenture of Lease, such junior or subsequent lessee shall first, as a condition of such lease, and before entering into the use of the Railroad Tunnel, pay to the Party of the Second Part, its successors, assigns, sub-lessees and legal representatives, one-half of the amount so paid, and if a third lease should be made, the lessee therein shall in like manner reimburse the prior lessees pro rata for such expenditures.

"In like proportion, and upon the basis provided in the first section of Paragraph 2 of Article III, any junior or subsequent lessee or lessees shall be obligated to pay for any betterments or improvements made subsequent to the execution of any such junior or subsequent lease or leases, and any amount for which the Party of the Second Part, its successors, assigns, sub-lessees and legal representatives, may be, or become, obligated to pay to the Party of the First Part under Paragraph I, Article III hereof. Any junior and subsequent lessee or lessees of the Railroad Tunnel shall in like proportion assume and pay the bond interest which accrues after the use thereof by any such junior or subsequent lessee or lessees.

"Any such junior lessee or lessees from the date of use, shall be required to pay such proportion of the maintenance and operation of said tunnel and equipment connected therewith and the insurance

respects contradictory. Perhaps it should be enough to say that the power of the Commission to make a lease is clear and explicit; that the trial court found, upon ample evidence, that the Commission had determined "the value of the separate and different uses to which the tunnel is to be put"; that there was no fraud alleged, proven or found; that the trial court found the terms of such lease to be fair and reasonable; and that we find, as will be hereafter seen, that except in certain minor and severable provisions, it is not in conflict with either the letter or the spirit of the statute. Turning briefly, however, to some of the contentions as to invalidity.

 It is contended that the Commission failed to determine the value of the different uses to which the tunnel is to be put, as required by the statute. Section 9 of the law provides that, in making leases, the Commission shall determine the value of the separate and different uses to which the tunnel is to be put, and shall apportion the annual rentals and charges as nearly as possible accord-

---

required herein as is represented by the use made of said Railroad Tunnel, measured in terms of cars and locomotives operated through said Railroad Tunnel, counting each locomotive as two cars, to be calculated and paid monthly.

"Such payments so to be made by such junior or subsequent lessee or lessees to be paid to the Party of the Second Part, or if paid directly to the District, to be credited by the District to the Party of the Second Part under the terms of this Contract and Indenture of Lease. All such junior and subsequent leases shall be made and executed in such manner and with such agreements, provisions, covenants and indemnities that the rights, interests, priorities and preferences of the Party of the Second Part shall be effectually preserved as herein set forth, and to the end that the operation of the Railroad Tunnel by the Party of the Second Part, its successors, assigns, sub-lessees and legal representatives, shall not be interfered with or impaired by such junior and subsequent leases, and such junior and subsequent lessee, or lessees, as a condition precedent to the delivery of such lease, shall make all payments herein required to be made to the Party of the Second Part, which are then due, and assume and agree to pay all further obligations as herein set forth." Article III, § 2.

In case of any litigation which deprives the lessee of the use of the tunnel, the rent shall be abated during such period and the lease extended for an equal period. Article III, § 3.

The lessee, its successors, assigns, sub-lessees and legal representatives, are given the right to assign the lease, either in whole or in part, or to make a sub-lease of the leased property to the owner or owners of another railroad, and to permit the use of said railroad tunnel by other railroads on such terms and provisions as may be agreed upon between the railroads; in case of such assignment or sub-lease, the other railroads shall be bound by the terms of this lease; if any payments are made under such assignment directly to the District, such payments shall be credited to the railroad lessee. Article III, § 4.

If the lessee ceases to be the owner and operator of the properties of the present Moffat Railway, the lease shall be assigned to the new owners thereof, who shall assume all the obligations of the lease; and the lessee shall be released therefrom "upon approval of said assignments by the party of the first part"; and provided that if the lessee does not acquire such properties by the time the tunnel is available for use, the lessor may declare the lease terminated. Article III, § 5.

It is provided that if the District shall execute junior and subsequent leases to the owner of any other railroad, that such junior and subsequent lease shall provide that the Moffat Railway shall be reimbursed in the proportion theretofore prescribed for any and all sums paid for the retirement of the principal and interest on the bonds, and for any expenditures theretofore made for betterments or improvements on the tunnel, and that such junior and subsequent lessee shall not be permitted to enter into the use of the tunnel until such payments are made. Article III, § 6.

In event the tunnel is not completed by January 1, 1928, the lessee may terminate the lease (Article III, § 7); the disposition of any surplus that may be in the hands of the Commission after the completion of the tunnel is provided for (Article III, § 8).

It is agreed that if the lessee is in default six months after written notice thereof, the lessor may declare the contract terminated, and repossess the tunnel; if rent is in default for one year, the contract shall be terminated without further action or notice, and the lessor "shall be entitled to the possession of the leased premises and may lawfully re-enter and repossess itself of the same, * * * and collect any and all rent due under this Contract and Indenture of Lease, up to the date of such termination thereof." Article III, § 9. It is then provided that if the lessee remains in possession, then the lessee shall be a tenant from year to year at the rentals reserved in the contract for the year next preceding such termination. Article III, § 10.

The lease is to be construed as a unit and every effort should be made to harmonize the various provisions therein contained, but that if any provision or paragraph contained in Articles I, II and III shall be declared to be illegal or invalid, such declaration shall not affect the remaining portions of the lease. Article III, § 11.

The District reserves the right to use such tunnel "for power transmission, telephone and telegraph lines, and other uses contemplated by the Moffat Tunnel Law, except the transportation of water"; if the District does lease the uses so reserved, the rental shall be credited to the lessees of the water tunnel and the railroad tunnel, upon the basis of the extent of the use; provided, that no such reserved use shall be so exercised as to interfere with the rights of the lessee, "and that any such reserved use shall always be subordinate thereto." It is further provided that nothing therein contained shall be construed as to prevent the lessee from transmitting power and using telephone and telegraph lines for its own purposes and without additional rental or charge therefor. Article III, § 13.

Exhibit "C" referred to in the above lease is a schedule of payments in dollars, for the full term of the lease.

A supplemental lease was made on March 25, 1927. The supplemental lease recites the making of the original lease and refers to the terms thereof. By the supplemental lease the lessee agrees to construct an adequate ventilating system for the tunnel and agrees that in case it may become necessary to electrify the tunnel, that it will install the necessary equipment therefor; the District to pay $250,000 of the cost thereof, and the lessee the excess. The ventilating system when installed, shall become the property of the District. It is provided that in event the tunnel cannot be safely operated with such equipment, the lessee shall nevertheless be liable to pay the rent and perform the covenants as provided in the original lease; and that the supplemental lease shall not in any manner modify or abrogate the terms of the original lease, except as expressly set out therein.

ing to the respective values of such uses; and that no lease shall be made unless the lessee pays as rental therefor an amount determined by the Commission to be a fair and just proportion of the total amount required to retire the bonds, and for the maintenance of the tunnel. It is contended that the Commission did not discharge its duty in these particulars. This claim is made notwithstanding the fact that the lease recites that the Commission had determined the value of the uses and determined the proportion of the value of the use of the tunnel for all railroad purposes; and further recites that it is made pursuant to a resolution which declares that—

"The Moffat Tunnel Commission has heard evidence and arguments from other sources, as well as from the applicants, and has made a scientific and thorough study in reference to the value of the uses applied for, and has made an exhaustive examination of its own data and information and all matters placed before the Commission by said applicants in reference to the value of the respective uses to which the tunnel may be adapted, * * * [and has determined that the value] * * * of the use of the Railroad Tunnel of the Moffat Tunnel for railroad purposes is hereby fixed and found to be sixty-six and two-thirds per cent (66⅔%) of the principal and interest of Moffat Tunnel Bonds and Moffat Tunnel Supplemental Bonds now outstanding, plus sixty-six and two-thirds per cent (66⅔%) of $18,000 per annum, the amount hereby determined to be necessary for the expenses and maintenance of the District."

Whether even a public Commission should be permitted to deny that such recitals are true, when contracts have been entered into upon the faith of such recitals, need not be determined, for we are satisfied from an examination of the record that the trial court correctly found that the Commission had adequately discharged its duty in these respects. The evidence shows that the Commission held repeated hearings for the purpose of determining just such facts; that it availed itself of much statistical data, and did make the findings in good faith and upon sufficient evidence.

But it is argued that the Commission did not determine the value of the telegraph, telephone or power uses of the tunnel, all of which are mentioned in the statute, or of the "other uses" likewise mentioned. But there is evidence that there was no prospect then of leasing the tunnel for such incidental purposes. The record therefore does not disclose that the tunnel was "to be put" to any such minor use. The contention that no lease for railroad or water use could be made until a lease could be secured for every conceivable minor use, is unsound legally and economically. The alternative, that the minor uses must nevertheless be valued and must be calculated in the percentages of total use, regardless of the possibility of converting such value into income, is unfair to the taxpayers, and in our opinion, unsound.

It is further argued that the Commission did not in fact determine the value of even the major uses, but only ascertained the cost of the two tunnels and apportioned the uses according to cost. The record is otherwise. The Commission properly considered cost as an element; but it likewise considered the "actual value of transportation obtained"; cost of maintenance; value to the lessees; and other matters. The water use was valued for municipal as well as irrigation purposes. Figures, statements and briefs were received from various parties, which reflected the value of the use to both lessor and lessee. The record discloses fifteen hearings of the Commission held between September 28, 1925, and January 5, 1926, devoted to these questions. Following such hearings and consideration, the Commission made the determination as set out in the resolution above quoted. But counsel argue that the lease is void because the determination was not stated in "intelligible terms of units of time, or units of traffic with some suggestion of the variation in value as years go on and some consideration of the period of use." Counsel say:

"We should expect to find in the records of the Board not merely material and evidence on the various types of use to which the tunnel could be put within any reasonable contemplation of time, or shifting conditions, but should also expect to find an investigation of the capacity of the tunnel in units of each of these uses and of the value of such units of capacity. We should expect to find some investigation of the number of trains or cars that could be carried through the tunnel in a day or some other period of time, some discussion of the cost of adapting the tunnel to vehicles driving upon their own wheels, some consideration of the power lines which could be installed and the number and place of their locations, some questioning at least into the locations of pipe lines beside the railroad tracks or within the Pioneer tunnel, some inquiry into the demand for, and

the future possibilities of these and a dozen other benefits."

■ Whether these factors entered into the mental processes of the members of the Commission in arriving at their conclusion we do not know, and may not inquire. In Chicago, B. & Q. Ry. Co. v. Babcock, 204 U. S. 585, 27 S. Ct. 326, 327, 51 L. Ed. 636, there was a like effort to dissect the mental processes of an administrative board; the cases differ only in that in the cited case, the dissector called the members to testify to the fact of faulty reasoning, while in the instant case we have only the statement of amici curiae to support the charge. But the Supreme Court held that it was not permissible to exhibit "the confusion of the members' minds, to attack in another proceeding the judgment of a lay tribunal, which is intended, so far as may be, to be final, notwithstanding mistakes of fact or law." In determining the value of uses, the Commission did the common-sense thing of determining those uses presently available for the tunnels, and declined to consider possible uses which might never be translated into rentals received. It expressed that determination in a percentage of the outstanding bonds, a determination readily convertible into dollars, which is an understandable and workable medium with which bond interest and principal were to be paid. The objections made are hypercritical and without merit.

■ Contention is then made that the lease is void because of the amount of rentals to be paid. The views of amici curiae are conflicting in this regard. Amici curiae represented by Mr. Rogers contend the lease is void because the rentals are too high. Their contention is that rentals cannot be arrived at by negotiations between the District and a prospective tenant; that the statute prescribes a mathematical formula which, when applied to the facts, produces a rental; if it is less than a tenant is willing to pay, the District cannot accept a higher rental even if offered; if it is more than any tenant will pay, the tunnel must lie idle and no revenues can be accepted therefrom. That formula takes as its starting point the $6,720,000 of bonds provided for in the statute; if there is applied to that the 87 per cent contended for by the District as the value of the railroad use, the result is a lesser rental than the lease provides for. Counsel admit this, saying, "The rental is not only much in excess of two-thirds of the authorized bond issue but it is based on a wholly different theory and computation." The argument overlooks the discretion vested in the Commission by section 9, enjoining it to apportion the rentals "as nearly as possible" according to the uses, and to determine the rentals as a "fair and just proportion" of the amount necessary to pay the principal and interest of the bonds. Furthermore, any construction that would put the Commission in such a strait-jacket that it could not accept a higher rental offered, or requires a tunnel to lie idle in the presence of an offer that would greatly relieve the burden of the taxpayers, should not be adopted unless the language of the statute clearly requires it. We find no such language.

■ Other amici curiae contend that the lease is void because the rentals are too low, and predicate such contention upon the theory that the rentals must be sufficient to save the taxpayers harmless; that the statute contemplates but the lending of public credit to a private enterprise. This construction ignores the Colorado Constitution, the decisions of the Colorado Supreme Court and the Supreme Court of the United States in the Milheim Cases, and has been heretofore discussed. Other amici curiae argue, with apparent seriousness, that the Act contemplates a $6,720,000 tunnel; that the lease covers a $15,000,000 tunnel; that the Commission has no power to lease a $15,000,000 tunnel. The hypothesis is unsound and the conclusion erroneous. It is true that the Act authorizes the issuance of $6,720,000 of bonds to pay for the construction of the tunnel; the Act of 1919, submitting the amendment to construct this tunnel, provided for the issuance of bonds, but further provided that "Any contract or liability attempted to be entered into or created, in excess of the amount realized from the sale of said bonds, shall be void." The legislature of 1922 must have been familiar with the 1919 Act, and the omission of such a clause should not be charged to inadvertence. Moreover, it is a matter of common knowledge that school buildings, courthouses and other public improvements are constantly being erected and paid for in part by bonds, and in part from building funds, current assessments or from other sources. Again, the statute expressly gives the Commission power to levy assessments upon real estate in the District "for the purposes provided in this act" (section 11), the principal one of which was the construction of a tunnel; as well as power to levy assessments to pay interest on and retire the bonds (section 13). So the hypothesis that the Act contemplates only a tunnel

costing $6,720,000 is unsound; the conclusion is likewise erroneous, for the fact remains that a $15,000,000 tunnel exists. If this argument is sound, the Commission is powerless under this statute to lease any use of the tunnel to anybody, on any terms. We can find no justification for ascribing such folly to the legislature of Colorado.

█ It is contended that the lease is void because it creates a monopoly in violation of the Moffat Tunnel Law. The Moffat Tunnel Law provides that—

"There shall be no monopoly of the use of said tunnel and its approaches by any one use, or by any person or corporation, private or public, in respect to the several uses, and the Board may continue to make separate and additional and supplemental contracts for one or more uses until, in the judgment of said Board, the capacity of the tunnel and approaches for any such use has been reached." Section 9.

The same section provides for the making of subsequent leases and provides that such subsequent lessees must reimburse the prior lessees for an equitable proportionate amount theretofore paid by the prior lessees for the retirement of bonds and interest, such amount to be determined by the Commission. The law was designed to insure the largest possible use of the tunnel, for the public good; it expressly prohibits one railroad from monopolizing the railroad use of the tunnel; but it does not prohibit the making of a lease by which one railroad pays for the entire railroad use of the tunnel, reserving to the Commission the right to make supplemental leases, if the first railroad does not avail itself of the full railroad use of the tunnel. On the contrary, it contemplates just such a lease, for section 9 expressly provides that "all contracts may be assigned or sub-leased," and there would be no occasion for subleasing if a railroad could not lease more of the use than it could avail itself of. The record, the resolution, and the lease, clearly show that the Moffat Railway contracted for the full railroad use of the tunnel, and for payment of a rental for such entire use. But monopoly was avoided, as contemplated by the law, by elaborate provisions in the lease for subsequent leases by the Commission for railroad purposes, the Railway being protected by provisions for reimbursement of prior payments on the bonds, and for the payment to the Railway of the rentals received from the subsequent leases. Furthermore, the statute and the lease reserve to the District the use of the railroad tunnel for other purposes, so long as such additional uses do not interfere with the enjoyment by the Railway of the railroad use. We conclude that the lease, read with the statute, does not offend against the anti-monopoly provision of the statute, either in letter or spirit.

█ Other amici curiae contend that the contract is void because it is a contract of lease, instead of a contract for use. The statute authorizes the Commission to enter into "leases"; it provides that all contracts "may be assigned or sub-leased"; it refers to "subsequent leases or contracts"; the opinions of the Supreme Courts of Colorado and of the United States, in the Milheim Cases, repeatedly referred to leasing of the tunnel; the statute does not contemplate that the District should acquire a railroad; it contemplates a leasing of the tunnel facilities; it provides for a maximum term of 99 years. The Commission did enter into an assignable lease, for the period authorized. We find no room for any metaphysical discussion of "contracts for use" and "leaseholds."

█ Other amici curiæ contend that the contract is illegal because the Railway is not bound for the full term, in that by Section 9 of the lease, the lease is terminated without notice and the lessor may re-enter if there is a default in the payment of rental for a year or more. Such provisions are familiar in leases and contracts of sale, and are uniformly held to be for the benefit of the lessor or vendor and may be waived by him. The contention that a party to a contract may relieve itself of liability by default in its own obligations thereunder, is unusual but not unprecedented. A similar contention was made in Stewart v. Griffith, 217 U. S. 323, 30 S. Ct. 528, 529, 54 L. Ed. 782, 19 Ann. Cas. 639, where the language was even stronger, the contract there providing that in case of default, the down payment "is to be forfeited and the contract of sale and conveyance to be null and void, and of no effect in law." There was a default and the seller brought an action for the balance of the price, and the buyer contended that by forfeiting the down payment, he was relieved of further liability, because the contract was then null and void. But the Supreme Court held otherwise, saying:

"The condition plainly is for the benefit of the vendor, and hardly less plainly for his benefit alone, except so far as it may have fixed a time when Stewart might have called for performance if he had chosen to do so, which he did not. This being so, the word

'void' means voidable at the vendor's election, and the condition may be insisted upon or waived, at his choice. Insurance Co. v. Norton, 96 U. S. 234, 24 L. Ed. 689; Oakes v. Manufacturers' Insurance Co., 135 Mass. 248, 249; Titus v. Glen Falls Ins. Co., 81 N. Y. 410, 419."

■ The District contends that the lease is violative of article 2, section 11, and article 5, section 25, of the Constitution of Colorado, which prohibit irrevocable grants of special privileges, franchises or immunities. But the lease is within the four corners of the statute, and the Supreme Court of Colorado held, in the Milheim Case, that the statute is not in conflict with such provisions. The District likewise contends, upon the last argument only, that the lease is void because certain provisions, the subject of the appeal in No. 261, are illegal. Reliance is placed upon a statement in Lingle v. Snyder (C. C. A. 8) 160 F. 627, 630, which while an action at law, does state the rule with accuracy as follows:

"If legal and illegal stipulations in a contract are independent and divisible the latter may be excluded and the former enforced, but when the parties have woven them together into a single agreement a court of justice will not unravel the good from the bad. This is doctrine that has come down from an early day."

■ The question then is: Are these illegal provisions independent and divisible? They are all for the benefit of the Railway, and it expressly concedes that they are severable, and elects to stand on the contract with such provisions eliminated. Furthermore, the District throughout this litigation conceded that they were severable, until such concession was withdrawn on final argument. But that the District believed they were severable until the last moment is at least an excellent aid to construction. When the parties contracted, they declared their intention that the various parts were independent and divisible (article III, § 11). True, such a contractual declaration is but an aid to construction, and will not justify a court in declaring a clause as divisible when, considering the entire contract, it obviously is not. Dorchy v. Kansas, 264 U. S. 286, 44 S. Ct. 323, 68 L. Ed. 686. We have so considered the contract as a whole, and conclude that the parts eliminated are independent and divisible, and that the intention of the parties was that the whole contract should not fall on account of their elimination.

■ Other amici curiae suggest that the lease be declared void, and the Public Service Commission of Colorado, or the Interstate Commerce Commission, should then compel the Railway to use the tunnel for a rental prescribed by one of those public bodies. But the statute reposes the power in the Commission, and this court cannot transfer the power to any other public agency, even if it were or could be empowered to discharge the duties tendered it by counsel. The contention that the lease should be set aside on account of mutual mistake will be discussed later. We conclude that the lease was within the power of the Commission, and is not illegal.

■ Coming now to the original contention of the District in this court, to wit, that the rental provision is illegal, and that this court should substitute therefor a fair and reasonable rental. On well settled principles, this relief can only be granted if the elements necessary for the reformation of contracts are present. Power resides in a court of equity to rescind a contract; it has the power to hold invalid parts of a contract, and if they be severable, to sustain the rest. But it has no power to strike down one clause of a contract and insert another, unless the elements necessary for reformation are present. But they are not present. The power of reformation is the power to make an agreement conform to the actual agreement made by the parties. Before a writing may be reformed to express the real agreement of the parties, the parties must have agreed. Columbian Nat. Life Ins. Co. v. Black (C. C. A. 10) 35 F.(2d) 571; Southern Surety Co. v. United States Cast Iron Pipe & F. Co. (C. C. A. 8) 13 F.(2d) 833; Travelers' Ins. Co. v. Henderson (C. C. A. 8) 69 F. 762. But there is not even a pretense in this case that the parties to the lease ever agreed upon a rental different from the one expressed in the lease. There does not exist, therefore, the very foundation stone upon which reformation must rest. The claim, made on closing argument, that the lease should be declared void on account of the claimed illegality of the rental provision, has been disposed of except as to the claim of mutual mistake, which was originally relied upon in support of reformation. The trial court found that there had been no mutual mistake, and the record fully bears out its finding. In fact, the lease itself completely repudiates the District's claim of mistake, either mutual or otherwise. Mistake is claimed primarily because the parties under-estimated the cost of

the tunnel, and the time of its completion. But the lease discloses that the parties contemplated that the tunnel might cost indefinitely more than the amount of the bonds outstanding, for the lease provides that in event the tunnel does cost more than contemplated, the rental shall be augmented by payments made after January 1, 1974, but puts a maximum of $1,000,000 on such excess rental. When the lease contemplated the possibility of the tunnel costing more than the outstanding bonds, and provided for an increase in rental to take care of that particular contingency, there can be no justification in a court prescribing a different and additional rental on account of the same contingency. The same thing is true as to the time of completion of the tunnel. While it was then estimated that the tunnel would be completed by January 1, 1927, another provision was made for the rights of the parties in case it was not completed even by January 1, 1928. Furthermore, neither of these matters is a mistake of fact; rather they were inaccurate prophecies. Chicago & N. W. Ry. Co. v. Wilcox (C. C. A. 8) 116 F. 913. It is argued that there was a mutual mistake of law, that is, that the parties misconstrued the underlying statute. This argument is bottomed upon the assumption that the District's present interpretation of the statute is correct; we think it is not, so there is no occasion to explore the question of whether such a mistake would avoid the lease. There is no basis for the claim of mutual mistake; nor is there anything in the record to justify the exercise of the power of reformation. We hold therefore that the rental provision is valid.

 In the discussion of the terms of this lease, and particularly the rental, the District and amici curiæ treat the matter as if the lease were now in the making, or as if the statute delegated to the court, instead of to the Commission, the power to enter into leases. Likewise they overlook the fact that the lessee must be consulted as to the terms of the lease. It must always be remembered that it was imperative that a lease should be made for railroad purposes, if the primary purpose of the Act was to be carried out. The Commission had no power to construct a railroad, and no means with which to construct one. The Moffat Railroad was the only railroad then constructed which was in position to use the tunnel. The possibility of another railroad constructing a line to the tunnel was, to say the least, remote. Practically speaking, the Commission was confronted with the dilemma of either entering into a lease with the Moffat Railway, or letting the tunnel stand idle. When the lease was made, the Railroad was in the hands of a receiver, and the line could not be re-organized without re-financing, and the necessary new capital could not be interested excepting on terms satisfactory to it. In the light of experience through the succeeding years it may be that the Railway could and would have paid a higher rental, although that is mere supposition, for the evidence does not disclose that its net revenues, at the time of the trial, had increased materially on account of its use of the tunnel; but even so, it is not at all clear that the Commission could have secured a higher rental at the time the lease was made, nor that it would have been advisable to postpone the leasing. Considering the circumstances as they existed at the time, we are satisfied with the trial court's conclusion that the rental provided for was fair and reasonable, and that the Commission discharged its duties with fidelity. But in any event, the law is clear that the determination of an administrative commission is conclusive on the courts, if it acts within its statutory powers, and its action is neither fraudulent nor arbitrary. United States v. Mackintosh (C. C. A. 8) 85 F. 333; Whitcomb v. White, 214 U. S. 15, 29 S. Ct. 599, 53 L. Ed. 889; Chicago, B. & Q. Ry. Co. v. Babcock, 204 U. S. 585, 27 S. Ct. 326, 51 L. Ed. 636; United States v. Budd, 144 U. S. 154, 12 S. Ct. 575, 36 L. Ed. 384. This general rule is buttressed by the provisions of the statute, for the very section which imposes these duties upon the Commission, concludes with the mandate that "the judgment and action of the Board on all matters referred to in this section shall be final except as specifically in this Act limited."

 It is further contended that the lease in question "was not a lease of the railroad use of the tunnel, but was limited by the express terms in the lease and the provisions of the Moffat Tunnel Act to the railroad which was purchased by the present company." This argument is predicated upon one of the recitals of the lease, to the effect that the lessee "has made application to said District to lease the railroad tunnel for the purpose of using the same in connection with the railroad and properties of the present the Denver & Salt Lake Railroad Company." From this recital the District argues that the lessee is without the power of assigning or subleasing any part of the tunnel. When the lease is considered in its entirety this contention appears to be wholly without merit. The Moffat Tunnel Law itself ex-

pressly provides that "all contracts may be assigned or sub-leased, provided that the original contracting party shall not be thereby relieved of any obligations under said contract or lease." Section 9. The granting part of the lease runs to "the party of the second part, its successors, assigns, sublessees and legal representatives." In almost every paragraph of the lease the same broad language is used. The powers of assignment and subleasing contained in the lease are not in violation of the statute and do not render the lease void.

■ Objection is further made to a provision in the lease which provides that the lease shall bind any successors to the lessee, and that "the party of the second part shall be released therefrom upon approval of said assignments by the party of the first part." Section 9 of the statute permits assignments but provides that the assignor "shall not be thereby relieved of any obligations under said contract or lease." The powers conferred upon the Commission undoubtedly are broad enough to permit it to cancel an existing lease with the consent of the lessee, and make another. The clause objected to amounts to that; it may release the Railway in case of a sale of its properties, but it is not required to. Such clause does not render the lease void.

A considerable portion of the record and briefs is devoted to the issue of estoppel raised by the Railway, and found against it by the trial court. A disposition of the cause without reference to estoppel seems more satisfactory; having so disposed of the case, reference to estoppel is not necessary, except to say that failure to discuss it is not a holding that the elements of estoppel have not been proven.

We conclude that the lease is valid except as otherwise determined on the cross-appeal; that the Commission discharged the duties imposed upon it in connection therewith; and that it cannot be reformed. Assignments of error in No. 260 are not well taken and the decree, so far as appealed from in No. 260, is affirmed.

### Appeal in No. 261.

The Railway has appealed from that part of the decree which eliminated certain provisions of the lease; and also that part which held it liable for rent from February 14 to February 26, 1928. The trial court found that the portions of the lease stricken concerned subordinate and incidental matters which did not go to the substance of the contract, and we concur in that holding for reasons heretofore stated.

■■ The parts stricken divide generally into two groups. The first group consists of the seven clauses first enumerated in paragraph six of the decree, and in general are of the same import. In various clauses in the lease where the Railway agrees to pay the rental, the agreement is modified by some such expression as "during any period that the railroad tunnel is used by the party of the second part." In the trial court the District contended that these expressions relieved the Railway of paying rental at any time when it chose not to use the tunnel, and thus converted the instrument into an option, which concededly would be invalid. However, the Railway disclaimed and now disclaims, any such limitation of liability flowing from such expressions; concedes that the lease is a firm contract for fifty years, and that it has no right to abandon the tunnel and relieve itself of its obligations. But aside from these concessions of the Railway, it is fundamental that if a clause in a contract is fairly susceptible of two constructions, the court will not give it that construction which devitalizes the clause or the contract. United States Fidelity & G. Co. v. Board of Com'rs (C. C. A. 8) 145 F. 144; Hobbs v. McLean, 117 U. S. 567, 6 S. Ct. 870, 29 L. Ed. 940; Williston on Contracts, § 620, p. 1202. We do not read the provisions stricken as giving to the Railway an option to abandon the tunnel. Other portions of the lease provide several contingencies in which the Railway is relieved of its obligations to pay rent, for example, if the tunnel was not completed by January 1, 1928; in event of an unforeseen catastrophe rendering the tunnel unfit for use; in event of certain litigation, or in event the lessee did not acquire, at the pending foreclosure sale, the properties then in receivership. We construe all of such clauses stricken as applicable only in event of the happening of such contingencies subsequently provided for in the lease, and make the covenant to pay rent consistent with such subsequent provisions. They do not convert the binding lease into an option, are not illegal, and should not have been stricken.

■ The remaining provisions stricken by the trial court were held to be in violation of the provision in the Moffat Tunnel Law which prohibited a monopoly of use, or involved an illegal delegation of power by the Commission. The trial court held that the Commission could not, an indefinite number

of years in advance, contract away its powers to insure as complete a user of the tunnel as circumstances might permit. We agree with this principle. The constitutionality of the law was sustained on the theory that the District was constructing "an avenue or highway which shall be leased to public transportation agencies" and because "it specifically provides for the use of the tunnel by any and all railroads and other public utilities, to the extent of its capacity." Milheim v. Moffat Tunnel Imp. District, 262 U. S. 710, 43 S. Ct. 694, 697, 67 L. Ed. 1194. The Supreme Court of Colorado construed the law as intending that "all can use it upon substantially the same terms." Milheim v. Moffat Tunnel Imp. District, 72 Colo. 275, 211 P. 649, 652. While the District was acting in its proprietary capacity in the making of the contract, the authority of its officers is limited by the provisions of the law, and all persons dealing with the Commission are charged with notice of such limitation of powers. The Commission had the power to lease to one railroad company all of the railroad use of the tunnel, as it did do; but until the total capacity of the railroad use of the tunnel had actually been reached, it must preserve the freedom of the District to make additional leases for railroad use, all to the end that the highway should be put to the greatest possible use. Any provision of the lease which undertook to prevent the District, no matter what the change in circumstances, from making a future lease that would avail the public of additional use of the tunnel, is invalid. At the same time it is the contemplation of the law, and is fair, that the revenues from such future leases of the same use shall be paid to a prior lessee who is then paying for an entire use of the tunnel. With these general propositions in mind, we come to the specific provisions stricken.

■■ The Commission agreed that it would enter into no future contract for a period of less than ten years, except with the written consent of the lessee. This provision is invalid and was properly stricken. It may be, as suggested by the Railway, that there is no probability of any short term lease ever being made; if so, there is no purpose to be served by the restriction, and there should be no objection to its elimination. But no one can say today that in forty years from now an opportunity may not be presented to make a subsequent lease of the railroad use for a shorter period, and the Commission had no right to barter away that chance.

■■ ■■ Section 2, article III, reserves to the District the right to enter into subsequent leases for railroad use. That right is "subject to the prior and preferential rights of the party of the second part." This clause was stricken. In this we think there was error. The law itself provides that subsequent leases "shall be subject to all existing and prior contracts." Section 9. While the first lessee, who has contracted for the entire use of the tunnel, may not prevent other use being made of it, it should have a prior and preferential right over a subsequent lessee. The right of subsequent leasing is also subject to the condition that "the total capacity or use of said railroad tunnel is not then being used and required by the party of the second part." The court struck this. For the same reason, we think this was in error.

■■ The same section provides that subsequent leases shall never be upon more favorable terms than are imposed upon the first lessee. The court struck this provision and we think properly. The Railway argues that such a provision is essential to its protection; that since the rental from subsequent leases comes to it, the District would have no interest in providing for an adequate rental from a subsequent lessee, and might make a lease for a large proportion of the use of the tunnel for a nominal sum. But the Commission cannot act arbitrarily. The law itself places upon the Commission the obligation of apportioning the annual rentals as nearly as possible according to the respective value of the uses; the law provides a further protection to the first lessee by providing that such subsequent leases "must provide for the reimbursement to the prior users of an equitable proportionate amount theretofore paid for the retirement of bonds, including interest thereon." Section 9. On the other hand, the value of a dollar might materially increase in fifty years, or other conditions materially change, and with this provision in the contract, the Commission would find itself badly handicapped in the making of future leases. The contemplation of the law, as indicated by the Colorado Supreme Court, is that all comers will be treated on substantially the same terms. The provision stricken goes farther than the law, is opposed to the underlying purpose of the law, and was properly stricken.

■■ The lease further provided that if the lessee should have expended any sums for betterments or improvements of the tunnel, or should have paid any part of the princi-

pal on the bonds, prior to the execution of any junior or subsequent lease, that such junior or subsequent lessee must pay to the lessee one-half of the amount so paid. It further provides that any junior lessee must pay one-half of the cost of any betterments or improvements made, or any bond interest paid, subsequent to the execution of such junior lease. The court struck such provisions from the lease. The law provides that any subsequent or junior lessee shall reimburse prior lessees in "an equitable proportionate amount theretofore paid for the retirement of bonds, including interest thereon." Section 9. The lease has substituted the arbitrary figure of "one-half" for the statutory figure of "an equitable proportion." The District might have the opportunity to make a lease of the tunnel in future years for a very small proportionate use of the tunnel, or for a very limited period of time; yet under the provision, such lease could not be made unless there was a reimbursement for one-half of certain sums theretofore expended by the lessee. The statute makes no provision for reimbursing a prior lessee for betterments made prior to the execution of the lease; and no provision concerning contribution for betterments made or bond interest paid subsequent to the execution of such junior lease. It might very well be that a provision for such reimbursement and contribution in a fair and equitable proportion, predicated on use, might be valid; but the parties have not so contracted. The parties have contracted on the basis of one-half, regardless of the extent or length of the use by the junior lessee, and regardless of the change in conditions which the future may bring. Such provisions are a distinct impairment of the powers of future Commissions and are monopolistic in character, and the trial court properly struck them.

The next paragraph of the lease provides that any junior lessee shall be required, from the date of use, to pay such proportion of maintenance and operation and insurance as is represented by the use it makes of said railroad tunnel, measured in terms of cars and locomotives operating through the tunnel. The trial court struck that part of the clause measuring the use in terms of cars and locomotives. In this we think there was error. The statute not covering the matter, the parties had a right to contract as they did, and the measurement used is a reasonably accurate and easily ascertainable method of arriving at a fair proportion.

The court struck from the next paragraph a provision that payments by junior lessees should be paid to the senior lessee, or if paid directly to the District, to be credited by the District to the senior lessee. Since the senior lessee has paid for the entire use of the tunnel, this is a valid provision and should not have been stricken. The court further struck the provision in the same paragraph to the effect that the junior lessee should make all payments required of it as a condition precedent to the delivery of such lease. This clause seems to be unobjectionable. The statute itself requires the junior lessee to reimburse the senior lessee for an equitable proportion of the amounts theretofore paid for the retirement of bonds, and we see no reason why the parties should not contract that such payment should be made prior to the delivery of the lease.

The next section stricken provides that if litigation is commenced against either the lessor or lessee, which results in the lessee being deprived of the use of the tunnel, the rent should be abated for such term. The trial court struck out the clause that abates the rent during that time. This seems to us to be a fair provision and not to be illegal. If by a court order the lessee were deprived of the use of the tunnel, we see no valid reason why the parties should not contract that the rent should be abated. It is assumed that the litigation is in good faith, and that the lessee is deprived of the use of the tunnel by an order of a court of competent jurisdiction.

The court struck out all of section 6 of article III of the lease. This is correlative to the provisions stricken requiring reimbursement to the extent of one-half, and provides that if junior leases are made, the leases themselves shall provide for reimbursement for the sums paid by the senior lessee on the bonds and for the betterments, as theretofore provided in the lease. But the proportion theretofore provided is one-half, and since that provision has been held to be invalid, it follows that section 6 is invalid.

The court also struck out section 8 of article III, which makes provision for any surplus moneys that may remain in the hands of the Commission after the tunnel is constructed. Apparently this clause was inserted as a corollary to the clause by which the lessee agreed to pay an additional rental if the tunnel cost more than the then outstanding bonds. It now being determined

736

that there is no surplus, any question as to section 8 is moot.

■■ Section 13 of article III reserves to the lessor the right to use the leased premises "for power transmission, telephone and telegraph lines, and other uses contemplated by the Moffat Tunnel Law * * * and the party of the first part may lease the uses reserved by this paragraph and apply the rent or proceeds therefrom to the credit of the lessees of the water tunnel and the railroad tunnel. * * *" The court struck from this section the latter portion, which directs that the rent shall be applied to the credit of the lessees. At the time this lease was made there were no available lessees for these incidental uses, and the lease properly reserved these uses to the District. The statute forbids a "monopoly * * * by any corporation * * * in respect to the several uses." If the lease had undertaken to confer upon the lessee a monopoly of all the uses, excepting water, it would have been in conflict with the underlying statute. While the lease did not do this, it did provide that any revenues from such incidental uses should be credited to the lessees of the railroad and the water tunnels. We are of the opinion that the court properly struck this provision. Taking the record as a whole, it is clear that the subject-matter was the railroad use of the tunnel, and the provision that the lessee of such railroad use should be the beneficiary of the revenues from all the incidental uses is, in our judgment, in conflict with the statute. The provision cannot be justified as being necessarily incidental to the railroad use, for another sentence of the same section authorizes the lessee "for its own purposes" to use the tunnel for the transmission of power, and for telephone and telegraph lines. However, in the same section the court struck the phrase "and that any such reserved use shall always be subordinate thereto." In this we think the court was in error; the lessee has contracted for the railroad use of the tunnel and is entitled to be protected in that use; the stricken provision properly and reasonably prohibits the Commission from making leases for other uses which would interfere with the railroad use contracted for.

■■ There remains but one question of importance. The record discloses that on the 14th day of February, 1928, the lessee commenced using the tunnel for all of its

freight trains and continued to so use it up until the day that it took formal possession of the tunnel on February 26. It did not use it, however, for its passenger trains. Nor was possession turned over, for the tunnel employees were working on the tunnel during this period, tamping the ballast, aligning the track, scaling the roof and doing other work. Under the lease, the Railway agreed to pay rental from the date the tunnel should be ready for use "and written notice to such effect given by the party of the first part." The written notice was not given until February 26. It is clear that it would be quite possible for the lessee to take possession of the tunnel and be liable for the rent, prior to or without a written notice. But the absence of a written notice has some evidential bearing on the question of whether the Railway took possession of the tunnel on February 14. The fact that it did not use the tunnel during those days for its passenger trains; the fact that no written notice was served until February 26; the fact that the tunnel employees were still engaged in completing the tunnel, and other evidence, leads us to the conclusion that the Railway did not in fact take possession under the lease until February 26. There is, therefore, no liability under the lease for rent. It is undisputed, however, that the Railway did use the tunnel for all of its freight trains during the days in question, and must have received considerable benefit from such use. It is our opinion that the Railway is liable for the reasonable value of the use which it made of the tunnel during that period. The trial court has made no finding of this fact, but has rendered a judgment predicated upon the rent reserved in the lease. If the parties cannot agree upon a reasonable value of the use of the tunnel for the days in question, this issue must be tried by the trial court.

The decree, as far as affected by the appeal in case No. 260, is affirmed; as far as affected by the appeal in No. 261, is modified as indicated herein; as to the rental for the period between February 14 and February 26, 1928, the cause is remanded with instructions to determine a reasonable rental for such period, and to further modify the decree accordingly. Costs in No. 261 to be divided equally.

Affirmed in No. 260.

Modified and reversed in No. 261.